**WALDREP BROTHERS BEAUTY SUPPLY, INCORPORATED, Plaintiff–Appellee,**

v.

**WYNN BEAUTY SUPPLY COMPANY, INCORPORATED, Defendant–Appellant.**

No. 92–1802.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1993.

Decided April 29, 1993.

---

Lowell S. Fine, Zoe Ileana Martinez, Alembik, Fine & Callner, Atlanta, GA, argued, for defendant-appellant.

Orville Gilbert Calhoun, Haynsworth, Marion, McKay & Guerard, Greenville, SC, argued (H. Donald Sellers, Haynsworth, Marion, McKay & Guerard, Stuart G. Anderson, Jr., Anderson, Fayssoux & Chasteen, Greenville, SC, of counsel), for plaintiff-appellee.

Before WILKINSON and HAMILTON, Circuit Judges, and HOWARD, District Judge for the Eastern District of North Carolina, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

Business competition produces success and failure; over time, only firms that satisfy their customers will survive. In this diversity case, plaintiff seeks to erect the tort law of South Carolina as a barrier to the forces of market competition. The customers in this case, Redken Laboratories, Inc. and Sebastian International, producers of beauty products, terminated their at-will contracts with plaintiff Waldrep Brothers Beauty Supply for the distribution of their beauty products in South Carolina. They replaced Waldrep shortly thereafter with defendant Wynn Beauty Supply.

This lawsuit followed, with Waldrep alleging that Wynn had tortiously interfered with Waldrep's contracts with Redken and Sebastian and had engaged in a civil conspiracy to destroy Waldrep's business. A jury found for Waldrep, and the district court denied Wynn's motion for judgment as a matter of law. We believe that the tort law of South

Carolina does not make legitimate competitive behavior actionable. Finding no evidence that Wynn did anything other than compete on the merits with Waldrep, we reverse the judgment of the district court and remand with instructions to enter judgment for the defendant.

## I.

Waldrep and Wynn were both in the business of supplying beauty products sold in salons. Waldrep sold Redken and Sebastian products to salons in South Carolina, while Wynn sold Redken products to salons primarily in Georgia, with some distribution in surrounding states. Waldrep's distribution agreements with Redken and Sebastian were non-exclusive and terminable at-will, with or without cause.

In September 1989, Jack Wynn, one of the two shareholders in Wynn Beauty Supply, went to Greenville, South Carolina to talk with David Waldrep, Sr. and David Waldrep, Jr. about a possible sale of Waldrep Brothers Beauty Supply. Because of David Waldrep, Sr.'s age and David Waldrep, Jr.'s illness, the family wanted to sell the business. After further discussions in December, Jack Wynn met David Waldrep, Sr. in January, 1990, and gave him a draft Letter of Intent to serve as the basis for negotiations.

In late January, Jack Wynn and Jim Cheek, the other shareholder in Wynn Beauty Supply, went to California to attend a Redken distributors meeting and the Barber and Beauty Supply Institute convention. While in California, the two men met with representatives from both Redken and Sebastian. Wynn claims that these meetings were to discuss Wynn's possible acquisition of Waldrep and to request Redken and Sebastian's permission for the assignment of Waldrep's distribution agreements to Wynn in the event of a sale. Redken and Sebastian personnel corroborated this account. David Waldrep, Sr. had permitted Wynn to discuss these matters with Redken and Sebastian. Waldrep claims, however, that the meetings were really an attempt by Wynn to do an end-run around the negotiations with Waldrep and to displace Waldrep as a distributor in South Carolina.

On February 20, Jack Wynn and Jim Cheek went to Greenville to continue the negotiations with Waldrep. During this meeting, Waldrep gave them a computer printout, dated February 19, of Waldrep's customer list and a card file of its C.O.D. customers. The negotiations reached an impasse over the price of certain assets, and David Waldrep, Sr. terminated the negotiations. Wynn returned the customer list on March 2. Waldrep claims, however, that when the list was returned it had two additional pages, dated February 21, which included the names of the C.O.D. customers on the card file. Waldrep alleges that Wynn kept a copy of the customer list, contrary to the requirements of the Letter of Intent. Wynn denied this allegation at trial.

In a letter dated March 14, 1990, Redken notified Waldrep of the termination of its distribution agreement. In a letter dated April 26, 1990, Sebastian did the same. Redken awarded Wynn distribution rights in South Carolina by letter dated April 18, 1990. Sebastian awarded Wynn distribution rights in South Carolina by telephone on April 27— Sebastian and Wynn had agreed in late March that Wynn would distribute Sebastian products in Georgia. Wynn had requested consideration as a distributor in both Georgia and South Carolina in late February after negotiations with Waldrep had broken off.

Representatives from both Redken and Sebastian plainly expressed their disappointment with Waldrep's performance. In explaining Redken's decision to terminate Waldrep and contract with Wynn, John Hammer, Vice–President of Redken U.S.A., testified that Redken expected sales of $500,000 during the 1990 fiscal year and that Waldrep had only purchased $186,132 in beauty supplies during the first eight months of that fiscal year. At that pace, Waldrep would only have purchased $275,000 for the fiscal year, a shortfall of $225,000. Moreover, Waldrep had not used educational and sales resources provided by Redken. Redken provided regional performing artists to conduct in-salon educational programs, but Waldrep failed to take advantage of this sales resource. Hammer already was considering potential new distributors for South Carolina quite inde-

pendently of any activity by Wynn. Hammer testified that Redken had particular confidence in the Wynn organization because of its positive track record with Wynn in Georgia.

Scott Cox, Vice–President of Sales for Sebastian, reported similar dissatisfaction with Waldrep. He testified that Waldrep was "cherry picking" Sebastian's product line, selling the most popular products and neglecting other items. As a consequence, Waldrep had failed to meet its minimum purchase requirements for a number of Sebastian products. Furthermore, Waldrep was not conducting educational events and in-salon classes, did not have specialists, and was not sending personnel to Sebastian's annual meetings and educational seminars. Cox also was concerned by the fact that he had been unable to contact David Waldrep, Jr., his principal contact with the Waldrep organization, for approximately eight months. Cox decided that Waldrep could not keep up with Sebastian's plans for the next ten years. Cox also had several applications for the South Carolina distributorship. After receiving favorable reports on Wynn from a number of distributors in the region, Sebastian approved Wynn as a distributor first in Georgia and later in South Carolina.

Waldrep filed suit on January 11, 1991, alleging that Wynn had breached the confidentiality provisions of the Letter of Intent and had intentionally interfered with Waldrep's contractual relations with Redken and Sebastian. The count for breach of the confidentiality provisions was dropped, however, and at trial the jury was given two issues to decide: (1) civil conspiracy to destroy Waldrep's business, and (2) intentional interference with Waldrep's contractual relations. The jury returned a general verdict for Waldrep for $789,000 in actual damages and $125,000 in punitive damages. The district court denied Wynn's post-trial motions, and Wynn now appeals.

## II.

It is important to understand at the outset the precise nature of Waldrep's business relationship with Redken and Sebastian. Waldrep's contracts with Redken and Sebastian were non-exclusive and terminable at-will, with or without cause. These provisions for termination at-will substantially limited Waldrep's remedies against Redken and Sebastian. Waldrep did not bargain for the security provided by a guaranteed contract, and hence did not bring any action for wrongful termination of its distributorship. By bargaining for the at-will provisions, Redken and Sebastian provided themselves with the freedom to search for a superior distributor if they ever became disappointed with Waldrep's performance. At the same time, Redken and Sebastian could use the threat of termination to help ensure efficient performance by their distributors under the contracts. In this case, Redken and Sebastian were plainly dissatisfied with Waldrep's performance; they exercised their contractual rights to find an enterprise that would do a better job distributing their products.

 Waldrep attempts to evade the limits of its agreements with Redken and Sebastian by coming after Wynn. Instead of contract claims against Redken and Sebastian, Waldrep asserts tort actions for civil conspiracy and intentional interference with contractual relations against Wynn. Under South Carolina law, "[a] civil conspiracy ... consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage." *Lee v. Chesterfield Gen. Hosp., Inc.*, 289 S.C. 6, 344 S.E.2d 379, 382 (1986) (citations omitted). To state a claim for intentional interference with a contract, a plaintiff must prove: "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." *DeBerry v. McCain*, 275 S.C. 569, 274 S.E.2d 293, 296 (1981). The courts of South Carolina have held that an at-will contract can be the basis for a claim of intentional interference with contract. *Bocook Outdoor Media, Inc. v. Summey Outdoor Advertising, Inc.*, 294 S.C. 169, 363 S.E.2d 390, 394 (1987). The jury found for Waldrep on both of these causes of action.

Wynn contends, however, that the district court failed to recognize the protection that South Carolina law provides to legitimate

business competition. According to Wynn, this error manifested itself in two ways: (1) the district court rejected Wynn's argument that the intent to harm the plaintiff must be the "primary" purpose of a civil conspiracy; and (2) the district court rejected Wynn's argument that competitive acts were privileged against claims of intentional interference with contractual relations. In sum, Wynn invokes competition both as the purpose of the alleged conspiracy and as the justification for "interfering" with Waldrep's contracts with Redken and Sebastian.

■ We agree that Wynn was entitled to judgment as a matter of law. To prove a claim of civil conspiracy, Waldrep was required to prove that the "'*object* [of the conspiracy was] to ruin or damage the business of another.'" *LaMotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66, 370 S.E.2d 711, 713 (1988) (quoting *Charles v. Texas Co.,* 199 S.C. 156, 18 S.E.2d 719, 724 (1942); emphasis added). The evidence in this case, however, demonstrated that Wynn's object was simply to make money by distributing beauty products in South Carolina; there was no evidence that Wynn acted with malice towards Waldrep. The only harm that Wynn intended to cause Waldrep was the incidental harm to competitors that is necessarily part of all legitimate business competition. To be sure, Waldrep was harmed by the loss of business, but those losses must be considered against the gain to Redken and Sebastian from having a more energetic and efficient distributor. That increased profits for one enterprise may come at the expense of a competitor is a fact of life in a market economy. We cannot, however, simultaneously encourage competitors to compete and hold them liable in tort whenever they do so successfully.

■ Competition also provides Wynn's justification for interfering with Waldrep's at-will contracts. While one cannot interfere as a matter of malice or spite with an at-will contract, it is altogether legitimate for a provider of services to persuade potential purchasers of those services that it can do the superior job. *See Restatement (Second) of Torts* § 768, at 39 (1977) ("One who intentionally causes a third person ... not to continue an existing contract terminable at will does not interfere improperly with the other's relation if ... his purpose is at least in part to advance his interest in competing with the other."). *See also* W. Page Keeton et al., *Prosser and Keeton on Torts* § 129, at 987–88 (5th ed. 1984) (Lawyer's ed.) (collecting cases). The evidence in this case demonstrated that Redken and Sebastian terminated the contracts because they were dissatisfied with Waldrep's performance and they believed that Wynn could do better. The record is replete with Redken's and Sebastian's expressions of discontent with Waldrep's failure to promote their products vigorously. Sanctioning Wynn for competing to gain the distribution contracts would deprive Redken and Sebastian of their contractual entitlement to seek a more efficient distributor. Business tort law should reinforce legitimate contractual arrangements, not undermine them.

■ Moreover, Waldrep offered no evidence that Wynn used improper means to secure the distribution agreements. What constitutes improper means may be somewhat difficult to distill as a rule of law, but the perspective of consumer welfare provides some guidance. Business rivalry that promotes lower prices, better products, or more efficient services is justified, while business conduct that seeks to impose costs on rivals in order to gain an advantage in the market is not. It is the latter conduct that constitutes improper means under the law of civil conspiracy and cannot serve as justification under the law of intentional interference with contractual relations. *See Charles v. Texas Co.,* 192 S.C. 82, 5 S.E.2d 464, 472 (1939) (holding allegations of slander, sabotage, and intimidation were sufficient to state claim for civil conspiracy); *Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 837 (1987), *cited with approval in Crandall Corp. v. Navistar Int'l Transp. Co.,* 302 S.C. 265, 395 S.E.2d 179, 180 (1990) (In case for intentional interference with an at-will contract, "[i]mproper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of

64

a fiduciary relationship."). In this case, Wynn harmed Waldrep only by promising better service to Redken and Sebastian. Those firms believed that Wynn would sell more of their beauty products in South Carolina. Promising better services fits squarely into the privilege for legitimate business activity.

Waldrep's attempts to point to examples of malfeasance on the part of Wynn are ultimately unavailing. It is true that Waldrep and Wynn could not reach agreement on the sale of Waldrep's business, but disagreements over the fair price for the sale of a company cause negotiations of this character to break down all the time. Waldrep cannot transform the failure of its negotiations with Wynn into a shield against future competition for the South Carolina territory. Such a rule would not only chill competitive activity, but would also discourage good-faith negotiations for the sale of business enterprises. The only additional contention made by Waldrep of improper activity by Wynn was the alleged appropriation of Waldrep's customer list. Before trial, however, Waldrep abandoned its count for unlawful appropriation, and at trial produced only the most circumstantial evidence that Wynn retained the list and no evidence that Wynn had used the list. Moreover, Waldrep did not attempt to explain on appeal exactly how Wynn used the customer list to Waldrep's detriment in the course of talks with Redken and Sebastian.

### III.

Affirming the judgment in this case would erect barriers in tort to the competitive behavior protected by the law of contract. The implications of that course for the legitimate conduct of business activity would be severe. For the above reasons, we reverse the judgment of the district court and remand with instructions to enter judgment for the defendant in this case.

REVERSED AND REMANDED WITH INSTRUCTIONS.