UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

COLLINS ENTERTAINMENT
CORPORATION, a South Carolina
Corporation,
<u>Plaintiff-Appellant,</u>

v.

DREWS DISTRIBUTING, INCORPORATED,

<u>Defendant-Appellee,</u>

and

LEISURE TIME TECHNOLOGIES,
INCORPORATED, formerly known as
US Games Incorporated,
<u>Defendant.</u>

No. 98-1083

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr., District Judge.
(CA-96-3398-6-13)

Argued: January 26, 1999

Decided: March 9, 1999

Before NIEMEYER, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Eric Steven Bland, BLAND & NEEDLE, L.L.P., Columbia, South Carolina, for Appellant. Arthur Camden Lewis, LEWIS,

BABCOCK & HAWKINS, L.L.P., Columbia, South Carolina, for Appellee. **ON BRIEF:** Mary G. Lewis, LEWIS, BABCOCK & HAWKINS, L.L.P., Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Collins Entertainment appeals a directed verdict entered by the district court in its suit against Drews Distributing alleging tortious interference with contract and unfair trade practices under South Carolina law. Because we agree with the district court that Collins failed to present sufficient evidence in support of either claim, we affirm.

I.

Appellant Collins and appellee Drews are both in the gambling business and compete to distribute in South Carolina the wildly popular gambling machine called Pot-O-Gold.[1] Leisure Time Technologies (formerly U.S. Games)[2] sells Pot-O-Gold to distributors.

In 1992, Collins became Leisure Time's exclusive distributor of Pot-O-Gold in South Carolina, subject to a quarterly quota, violation of which would allow Leisure Time either to terminate the distribution contract or to change Collins' rights to those of a non-exclusive distributor. Collins used the Pot-O-Gold machines both for resale (distribution) and for its "routes," locations where it would install and maintain its own machine. Beginning in the third quarter of 1993,

_____

[1] According to counsel for Drews, the machine's popularity likely results from it having "lots of lights" and little balls that "drop down and go `ding, ding, ding.'"

[2] For simplicity, we refer to this company throughout as Leisure Time.

2

Collins admittedly was in violation of its quota by not purchasing any Pot-O-Golds. Rather than terminate its contract with Collins, however, Leisure Time, on October 8, 1993, merely changed Collins' status to that of a non-exclusive distributor.

Meanwhile, at two gambling-industry conventions in 1993 (prior to October), Leisure Time, in an effort to find a more reliable distributor, discussed with Drews the possibility of Drews distributing Pot-O-Gold in South Carolina. The evidence shows that Leisure Time approached Drews and that Drews did not then know the nature of Collins' arrangement with Leisure Time. Hugh Andrews, president of Drews, testified to this effect in describing a conversation at one of the conventions:

> [They] asked would we be interested in being a distributor. And I said, "Well, y'all already got a distributor."
>
> . . .
>
> They said, "well, Mr. Collins is not buying his quotas or he hasn't bought anything from us in a long time. We don't think he's going to buy anything from us and we were wondering if you'd consider being our distributor." I said, "well, if that ends up being the case, let me know and we'll talk about it."

J.A. 231. See J.A. 327 (Thomas Klingel, official of Leisure Time, stating that "I brought it up with Hugh"). Drews' Vice President testified similarly: "We were in a conversation at a trade show most likely, and [Mort Ansky of Leisure Time] had discussed that he had a contract with Fred [Collins]. I was interested in purchasing at some point during that time and, you know, we never got to the point of trying to send a purchase order or me actually going to try to buy the games." J.A. 175-76.

These preliminary discussions with Drews were materializing into full negotiations by early October (about the time that Leisure Time was changing Collins' status to that of a non-exclusive distributor), and they matured into a purchase by Drews of some Pot-O-Golds in

late October 1993 and an exclusive-distributorship contract signed in early November.

In the exclusive distributorship contract with Drews, Leisure Time included a carve-out granting Collins a right to purchase machines for its routes. Officials from Drews admit to having been surprised over this reservation, but they ultimately agreed to it, reasoning that not only would Collins not be distributing, but Drews also would not be losing potential sales to Collins for its routes because Collins likely would never make such purchases from its arch-rival. Further, Drews had reason to believe that not even sales by Leisure Time for Collins' routes would occur. As Mr. Andrews subsequently testified, Leisure Time had told him during negotiations in the fall of 1993 that it had cancelled Collins' contract.[3] And Andrews' testimony was corroborated by an October 11, 1993, letter to Drews from Mort Ansky of Leisure Time in which Ansky, referencing a meeting of a few days before at which the two companies had agreed to a distributorship arrangement, wrote "I am in the process of having the attorneys draft a letter to any former commitments that we have made in the past."

In November 1995, Drews and Leisure Time renewed, with similar terms, their exclusive-distributorship agreement. However, beginning in the spring of 1995, Collins had resumed purchasing Pot-O-Golds from Leisure Time, at least some of which were for resale. By Collins' admission, "Leisure Time did not hesitate in selling games" to it, at least not until sometime in 1996, when Leisure Time's inconsistent obligations to Drews and Collins became known.

The revelation that Leisure Time was selling Pot-O-Golds to Collins notwithstanding Leisure Time's exclusive distributorship with Drews predictably caused dissension, and in 1996, Collins sued both Drews and Leisure Time, and Drews sued Leisure Time. Collins

_____

[3] In the related case of Drews Distributing, Inc. v. Leisure Time Technologies, Inc. (D. S.C. 1997), the same district court judge, after a bench trial, found that "Leisure Time continually withheld from Drews material facts regarding the true nature of Collins' relationship with Leisure Time and Leisure Time's awareness of Collins' sales of its machines in South Carolina." The appeal, argued December 1, 1998, is pending before this court. Docket No. 97-2391.

4

alleged that Leisure Time breached the non-exclusive (post-October 1993) distributorship agreement, that Drews tortiously interfered with Collins' distributorship agreement, and that both Leisure Time and Drews violated the South Carolina Unfair Trade Practices Act ("SCUTPA"). S.C. Code § 39-5-20. Collins also brought federal claims of antitrust violations and price discrimination, which it later withdrew. The district court retained the case under supplemental jurisdiction.

After trial, the district court directed a verdict for Drews. As to tortious interference with contract, the court held that there was "no or insufficient evidence to show that Drews had any knowledge of [the] contract [between Leisure Time and Collins]" and "absolutely no evidence that there was an intentional procurement of a breach." As to SCUTPA, the court found "no evidence of any deception." The same day, a jury concluded that Leisure Time had breached its contract with Collins, but awarded zero damages.

Collins appealed the directed verdict. A motions panel of this court subsequently denied Drews' motion to dismiss the appeal as untimely.

II.

Collins primarily, and almost exclusively, argues that Drews tortiously interfered with its exclusive distributorship agreement with Leisure Time prior to October 8, 1993, causing Leisure Time to change Collins' distributorship status from exclusive to non-exclusive on that date. Because this change in status was not a breach of Collins' contract with Leisure Time, Collins cannot prevail on this argument. Collins also argues, albeit sporadically, that, after October 8, Drews tortiously interfered with Collins' non-exclusive agreement. Under federal law, see Mattison v. Dallas Carrier Corp., 947 F.2d 95, 99 (4th Cir. 1991), a directed verdict is proper unless the party opposing such a motion has presented at trial "substantial evidence which shows a probability and not a mere possibility of proof," Bailey v. County of Georgetown, 94 F.3d 152, 157 (4th Cir. 1996) (citation omitted). Because Collins failed to present "substantial evidence" that Drews tortiously interfered with Collins' agreement with Leisure Time after October 8, Collins cannot prevail on this argument either.

5

First, Collins could not prevail on its chief argument even if its factual contention against Drews were true. For tortious interference with contract is only possible when that interference has caused an underlying contractual breach. See Collins Music Co. v. Smith, 503 S.E.2d 481, 482 (S.C. App. 1998) ("The nexus between the two causes of action is the breach of the contract, for . . . breach of the contract is an element of both causes of action."); Bocook Outdoor Media, Inc. v. Summey Outdoor Advertising, Inc., 363 S.E.2d 390, 394 (S.C. App. 1987) ("[T]he alleged act of interference must influence, induce, or coerce one of the parties to the contract to abandon the relationship or breach the contract."), overruled on other grounds, O'Neal v. Bowles, 431 S.E.2d 555 (S.C. 1993).

Collins repeatedly argues that Drews interfered prior to October 8, 1993, and caused Leisure Time to change Collins' status to that of a non-exclusive distributor. See Appellant's Br. at 21 ("But for the intentional interference by Drews with Collins Entertainment's contractual relationship with Leisure Time throughout 1993, Collins Entertainment would have continued to meet its quarterly minimum purchase requirements [and] retained its exclusive right to market and sell the Pot-O-Gold machine. . . .") (emphasis added); id. ("Drews interfered with Collins Entertainment's exclusive distributorship agreement that was in effect from May 3, 1992 through October 8, 1993. . . .") (emphasis added); id . at 24 (Drews conspired with Leisure Time to have Leisure Time terminate its exclusive distributorship agreement with Collins . . . .") (emphasis added). At oral argument, counsel for Collins made similar statements three separate times, concluding his argument with the observation that "[o]ur case against Drews . . . concerns January '93 up to [ ] October 8, '93."

But Leisure Time's change of Collins' status on October 8, 1993, was not a breach, nor has Collins so alleged or argued. If anything, Collins was in breach for not meeting its quota. See Appellant's Br. at 9 ("Leisure Time exercised its rights under the Agreement to modify Collins to a non-exclusive basis."); J.A. 25 (Collins' complaint, stating that "[t]he default [by Collins] resulted in a modification of the Distributorship Agreement"). Thus, in effect, Collins argues that Drews, by intentionally procuring action that was not a breach of contract, committed a tort that cannot occur absent a breach. Collins itself inadvertently calls attention to this fatal defect in its argument:

6

> Collins [sic] claim for breach of contract against Leisure Time was for Leisure Time's breach of its <u>non-exclusive</u> distributor agreement <u>after October 8, 1993</u>. Conversely, its tortious interference with existing contractual relations claim asserted against Drews was for interference with Collins' <u>exclusive</u> distributor agreement <u>prior to October 8, 1993</u>.

Appellant's Rep. Br. at 6 (emphases added). Because intentionally procuring a non-breach does not -- indeed cannot-- amount to tortious interference with contract, the district court correctly entered a directed verdict for Drews.

At one point in oral argument Collins contended, notwithstanding its virtually exclusive emphasis on Drews' and Leisure Time's pre-October 8, 1993, conduct, that its claim of tortious interference actually had "two components," the first discussed above and the second relating to post-October 8 conduct by Drews -- particularly Drews' late-October purchase from Leisure Time and the November signing of the distributorship agreement. <u>Cf</u>. Appellant's Rep. Br. at 4 (referring to "Drews' conduct of having interfered with Collins' exclusive and non-exclusive agreements with Leisure Time").

A directed verdict was likewise justified as to this second "component." The elements of tortious interference with contract are "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the intentional procurement of the breach; (4) the absence of justification; and (5) resulting damages." <u>Todd</u> v. <u>South Carolina Farm Bureau Mut. Ins. Co.</u>, 336 S.E.2d 472, 473 (S.C. 1985). Failure on any of these elements is fatal, and Collins failed to present substantial evidence in support of at least three.

First, Collins cannot satisfy element (2) because Drews lacked any significant knowledge of Collins' distributorship agreement, <u>particularly</u> after October 8. The evidence overwhelmingly suggests that Drews thought Leisure Time had cancelled its contract with Collins or, at most, had a contract allowing Collins to purchase only for its routes. Of course, Leisure Time had not cancelled its contract with Collins; nor did Leisure Time have a contract with Collins only allowing purchase for Collins' routes.

7

Second, Drews could not have intentionally procured the breach of a contract that it did not know about, and thus cannot satisfy element (3). Even if it had known about the contract, the overwhelming evidence shows, as the district court found, that Leisure Time sought out Drews, not vice versa.

Third, even if Drews knew about the contract and intentionally procured its breach, Drews had the justification of legitimate competition, and thus Collins cannot satisfy element (4). Drews essentially said to Leisure Time, at most, "Give us the contract. We can do better than Collins." The law encourages such competitive conduct. In Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co., Inc., 992 F.2d 59 (4th Cir. 1993), which involved a claim of tortious interference with contract under South Carolina law, we held that "[b]usiness rivalry that promotes lower prices, better products, or more efficient services is justified . . .," and explained that, although malicious interference with a contract is not justified, "it is altogether legitimate for a provider of services to persuade potential purchasers of those services that it can do the superior job." Id. at 63. That is, at most, what occurred here. Although Collins suggests that Drews went beyond legitimate competition and urged Leisure Time not to fill Collins' orders, it has offered no evidence of such conduct.

III.

Our disposition of Collins' claim of tortious interference with contract also effectively disposes of its SCUTPA claim against Drews. A violation of SCUTPA requires, inter alia, some "unfair or deceptive act or practice." Columbia East Assoc. v. Bi-Lo, Inc., 386 S.E.2d 259, 263 (S.C. App. 1989). The district court found "no evidence of any deception," and Collins has not pointed us to any on appeal, other than its own conjecture. In any case, Collins' SCUTPA claim merely reiterates its failed arguments for tortious interference. See Appellant's Br. at 25 ("[I]t is unethical when two parties combine and enter into a contract, while knowing that one of the parties has already entered into a valid contract with another party that is ongoing, and in effect take actions to divest the first contracting party of its rights under the agreement."). Absent substantial evidence that Drews knew about and intentionally procured the breach of Collins' contract with Leisure Time (whether exclusive or non-exclusive), and did so with-

8

out justification, there is no basis for any rational jury to find that Drews did anything unfair or deceptive.

Accordingly, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

9