<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 08-1279**

---

BCD LLC; ROSEN CAMPUS I LLC; CR MERC LLC; ROSEN WT
MANAGEMENT LLC,

        Plaintiffs - Appellants,

     v.

BMW MANUFACTURING COMPANY LLC, formerly known as BMW
Manufacturing Corp.,

        Defendant – Appellee,

     and

SOUTH CAROLINA DEPARTMENT OF COMMERCE; DWIGHT F. DRAKE;
NELSON MULLINS RILEY & SCARBOROUGH LLP; CLEMSON UNIVERSITY;
CLEMSON UNIVERSITY FOUNDATION; CLEMSON UNIVERSITY REAL
ESTATE FOUNDATION; AMREC; THE FURMAN COMPANY; STEPHEN P.
NAVARRO,

        Parties-in-Interest.

---

**No. 08-1448**

---

BCD LLC; ROSEN CAMPUS I LLC; CR MERC LLC; ROSEN WT
MANAGEMENT LLC,

        Plaintiffs - Appellants,

     v.

BMW MANUFACTURING COMPANY LLC, formerly known as BMW
Manufacturing Corp.,

        Defendant – Appellee,

and

SOUTH CAROLINA DEPARTMENT OF COMMERCE; DWIGHT F. DRAKE; NELSON MULLINS RILEY & SCARBOROUGH LLP; CLEMSON UNIVERSITY; CLEMSON UNIVERSITY FOUNDATION; CLEMSON UNIVERSITY REAL ESTATE FOUNDATION; AMREC; THE FURMAN COMPANY; STEPHEN P. NAVARRO,

Parties-in-Interest.

_____

Appeals from the United States District Court for the District of South Carolina, at Greenville.  G. Ross Anderson, Jr., Senior District Judge.  (6:05-cv-02152-GRA)

_____

Argued:  September 22, 2009          Decided:  January 8, 2010

_____

Before MOTZ and KING, Circuit Judges, and Mark S. DAVIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Davis wrote the opinion, in which Judge Motz and Judge King joined.

_____

**ARGUED:** James Robinson Gilreath, GILREATH LAW FIRM, Greenville, South Carolina, for Appellants.  Henry Donald Sellers, HAYNSWORTH, SINKLER & BOYD, PA, Greenville, South Carolina, for Appellee.  **ON BRIEF:** Charles E. Carpenter, Jr., Carmen V. Ganjehsani, CARPENTER APPEALS & TRIAL SUPPORT, LLC, Columbia, South Carolina; William M. Hogan, GILREATH LAW FIRM, Greenville, South Carolina; Charles W. Whetstone, Jr., Cheryl F. Perkins, WHETSTONE MYERS PERKINS & YOUNG, LLC, Columbia, South Carolina; V. Laniel Chapman, Bruce A. Byrholdt, CHAPMAN BYRHOLDT & YON, Anderson, South Carolina, for Appellants.  J. W. Matthews, III, Christopher B. Major, HAYNSWORTH, SINKLER & BOYD, PA, Greenville, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

2

DAVIS, District Judge:

Clifford Rosen, a developer serving as the principal behind the entities of BCD LLC, Rosen Campus I LLC, CR-MERC LLC, and Rosen-WT Management LLC, appeals from the grant of summary judgment against him on his claims of tortious interference with contract, intentional interference with prospective contractual relations, and civil conspiracy. The district court disposed of the case on alternative grounds, holding that Rosen's claims were barred under the Noerr-Pennington doctrine and that summary judgment was appropriate because there were no genuine issues of material fact.

It is well-established under the doctrine of constitutional avoidance that a court should avoid deciding a constitutional question when it can dispose of a case on another basis. Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Finding that Rosen's claims can be decided on non-constitutional grounds of state contractual law, it is thus not necessary to reach the question of whether Rosen's claims were barred under the Noerr-Pennington doctrine. For the reasons that follow, we affirm the grant of summary judgment.

I.

This action arose out of a dispute related to the early developmental stages of a project that culminated in the

3

construction of Clemson University's ("Clemson") Carroll A. Campbell, Jr. Graduate Engineering Center ("GEC"). In 2001, Appellee BMW ("BMW") and Clemson, a public university located in South Carolina, explored possible educational initiatives on which they could collaborate. Clemson raised the idea of developing a wind tunnel that would cater to the racing industry and made a formal presentation of the idea to BMW executives. BMW indicated that it was not interested in funding a wind tunnel, but proposed an alternative plan of partnering with Clemson to establish the GEC as part of Clemson's International Center for Automotive Research ("CU-ICAR").

Clemson similarly approached Rosen about the possibility of developing a motorsports facility incorporating a wind tunnel, and Rosen expressed interest in the idea. For the purposes of negotiating an agreement, Rosen thus formed CR-MERC LLC ("CR-MERC"). The Clemson University Foundation ("CUF"), the fundraising arm of Clemson, formed a subsidiary called AMREC LLC ("AMREC") for the same purpose.

On April 4, 2002, Rosen (through CR-MERC) and Clemson (through AMREC) signed a nine-page "agreement" (the "2002 Agreement") to lay the foundation for the proposed development of the facility. The 2002 Agreement indicated that the laws of the state of South Carolina would govern all issues arising out of the agreement. Under its terms, the facility and surrounding

4

campus would consist of a combination of parcels, some donated by Rosen and the remainder donated by AMREC.

The 2002 Agreement, however, called for the parties to reach further agreement on twelve subject areas, identified as "Exhibits," by May 1, 2002. Pursuant to Paragraph 10, the 2002 Agreement thus remained terminable at will by either party if the parties could not reach an agreement on all of the subject areas. Specifically, the provision stated that if the parties failed "to agree to any of the Exhibits," then "at any time after May 1, 2002, either party may, upon ten (10) days notice to the other party cancel this Agreement, whereupon the parties shall be relieved of all obligations to each other." J.A. 800 (emphasis in original).[1]

The subject areas covered by the Exhibits encompassed material aspects of the deal, including how the land would be divided and developed. At a drafting session, however, the parties failed to reach an agreement on all of the subject areas. In particular, the parties marked two Exhibits as "NOT USED": "Exhibit F," the "Reciprocal Easements and Operating Agreement" and "Exhibit H," the "Master Association Agreement."

---

[1] Citations to "J.A." refer to the contents of the joint appendix filed by the parties in this proceeding.

The parties also did not sign "Exhibit G," which would have covered the allocation of parcels of land.

Rosen's attorneys thereafter commenced the drafting of a revised "Amended and Restated Master Agreement" to incorporate the non-used Exhibits F and H within a combined agreement entitled the "Declaration of Covenants, Conditions, Restrictions, and Easements" ("CCR"). The parties, however, never executed either of these documents.

Meanwhile, during the summer and fall of 2002, BMW and Clemson continued their negotiations and preparations in furtherance of the plan to construct the GEC. BMW identified the GEC as one of the projects that could be supported pursuant to the newly-enacted Bond Act, under which the State of South Carolina set aside funds for qualifying infrastructure projects that promoted economic development within the state. See S.C. Code Ann. § 11-41-10 et. seq. (2002). On July 29, 2002, the South Carolina Department of Commerce ("SCDOC") formally proposed incentives for BMW under the Bond Act, including $25 million earmarked for the development of the GEC. After the formal announcement, BMW and Clemson drafted a "Memorandum of Expectations" with respect to the GEC.

Rosen began to urge Clemson and BMW to consider utilizing property that he owned as the potential site for the GEC. BMW, however, emphasized the need to distinguish the state-funded GEC

6

from the privately-funded wind tunnel in which Rosen was involved, and Clemson declined to commit itself to using Rosen's property.   Rosen, in turn, interpreted BMW's criticism of the wind tunnel project as a reflection of the company's dissatisfaction with its lack of control over the development of the wind tunnel.   According to Rosen, this sentiment prompted BMW to launch a series of efforts designed to kill his project.  In particular, he claims that BMW exerted pressure upon private, governmental, and state-supported entities, including Clemson, to cease negotiations with him.

In January 2003, Rosen sent a letter to Clemson that expressed concerns about the progress of the wind tunnel project.   Clemson interpreted this letter as an indication that Rosen was no longer committed to the project, but Rosen subsequently sent another letter reiterating his determination to construct the wind tunnel.   Specifically referencing the terminable-at-will clause of the 2002 Agreement, Clemson's President responded with a letter on March 12, 2003 notifying Rosen that the 2002 Agreement constituted a mere letter of intent and that the wind tunnel deal was not final because all of the Exhibits to the 2002 Agreement had not been completed.

A couple weeks later, Clemson emailed Rosen a new proposed deal structure with two alternatives entitled "Option A" and "Option B."   In April 2003, Rosen made a counterproposal to

7

Clemson. Clemson found Rosen's counterproposal unacceptable, however. At this time, Clemson determined that it needed to consider a different site for the GEC and began to shift its focus toward the acquisition of a parcel of land separate from the property Rosen was acquiring – an option Clemson referred to as "Option C." Rosen subsequently continued to seek amendments to the old deal structure, but Clemson's attorneys drafted a letter on May 12, 2003 stating that, "[a]s there is currently no agreement, nothing will be amended." J.A. 1791.

Thereafter, Clemson and Rosen renewed negotiations under an entirely different deal structure and executed the Real Estate Purchase and Sale Agreement (the "2003 Agreement") on October 6, 2003. The 2003 Agreement provided for the sale of land for the GEC and addressed all material subject areas, including those areas that the 2002 Agreement had failed to address. Furthermore, the 2003 Agreement provided that the 2002 Agreement was "terminated for all purposes without any liabilities to any of the parties[.]" J.A. 690.

Rosen now characterizes his execution of the 2003 Agreement as a mere attempt to mitigate his damages and argues that he lost valuable property rights under the new deal. He thus filed this action in federal district court. BMW filed a motion for summary judgment, which the district court granted. Rosen subsequently filed a timely appeal.

8

In this appeal, Rosen contests the district court's grant of summary judgment, arguing that BMW was the direct cause of the unraveling of his project and that he is therefore entitled to recover damages for lost profits, development fees, and management fees. We disagree. In light of the fact that: (1) the parties never reached agreement on all of the essential terms of the alleged 2002 Agreement; (2) the 2003 Agreement expressly terminated the 2002 Agreement for all purposes; and (3) BMW at all times acted pursuant to its legitimate business interests, we find that summary judgment was appropriate.

## II.

We review a grant of summary judgment de novo on appeal, applying the same standard as the trial court without deference to the trial court. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123 (4th Cir. 1990). Summary judgment is appropriate when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc). A genuine issue of material fact is raised only if a reasonable

9

jury could return a verdict for the plaintiff on each element necessary to its case. Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1027 (4th Cir. 1997). As the nonmoving party below, Rosen had the ultimate burden of demonstrating a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997). Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Guided by this procedural standard of review, we analyze the merits of Rosen's appeal.


III.

On appeal, Rosen contends that the district court erred in granting summary judgment against him in light of the evidence presented. We disagree. At the outset, it is important to underscore the precise nature of Rosen's business relationship with Clemson. In particular, the parties were in the formative stages of negotiation and had never solidified the essential and

10

material terms of the document known as the "2002 Agreement."
The 2003 Agreement, moreover, terminated the 2002 Agreement for
all purposes.  On these facts, Rosen's remedies against Clemson
are substantially limited.

A.

Rosen first claims that BMW tortiously interfered with his
contract with Clemson.  Under South Carolina law, the elements
of a cause of action for tortious interference with contract
are: (1) the existence of the contract; (2) the other party's
knowledge of the contract; (3) the other party's intentional
procurement of a breach of the contract; (4) the absence of
justification; and (5) resulting damage.  Webb v. Elrod, 418
S.E.2d 559, 561 (S.C. Ct. App. 1992).  A tortious interference
claim thus "presupposes the existence of a valid, enforceable
contract."  Jackson v. Bi-Lo Stores, Inc., 437 S.E.2d 168, 171
(S.C. Ct. App. 1993).  The district court found that Rosen did
not show a genuine issue of material fact as to this cause of
action.  Viewing the evidence in the light most favorable to
Rosen, we similarly find that Rosen has not created a genuine
issue.

Taking all of Rosen's allegations as true, there is not a
valid, enforceable contract to support Rosen's tortious
interference claim.  In order to have a valid and enforceable
contract under South Carolina law, there must be a meeting of

11

the minds between the parties with regard to all the essential and material terms of the agreement. Player v. Chandler, 382 S.E.2d 891, 893-94 (S.C. 1989). There can be no contract so long as, in the contemplation of the parties thereto, something remains to be done to establish contract relations. Hughes v. Edwards, 220 S.E.2d 231, 234 (S.C. 1975).

Here, the record before us evinces no meeting of the minds between Rosen and Clemson with respect to all of the essential and material terms. Although the 2002 Agreement is, in essence, an "agreement to agree," such an agreement does not amount to a contract under South Carolina law. Trident Constr. Co., Inc. v. Austin Co., 272 F. Supp. 2d 566, 575 (D.S.C. 2003) (citing Blanton Enters., Inc. v. Burger King Corp., 680 F. Supp. 753, 770 n.20 (D.S.C. 1988)). The parties merely agreed to enter into negotiations to reach an agreement, but subsequently failed to reach an actual agreement on essential terms pertaining to land allocations, divisions of parcels, and restrictive covenants for the property. See Fici v. Koon, 642 S.E.2d 602, 604-05 (S.C. 2007) (noting that, in a real estate contract, a description sufficient to show with reasonable certainty the location of the land and its boundaries is necessary); Player, 382 S.E.2d at 893-94 (finding a description of the extent and boundary of the property to be an essential term of a contract pertaining to real estate). Therefore, inasmuch as substantial

12

and necessary terms remained open for future negotiation and the parties failed to reach an agreement on these terms, the 2002 Agreement never rose to the level of an enforceable agreement. See Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 407 (4th Cir. 2002) (stating that, in preliminary negotiations, when terms are indefinite and basic terms have not been agreed upon, there is no basis to fashion a remedy, and thus no enforceable contract).[2]

Furthermore, assuming arguendo that the parties had formed a valid, enforceable contract, Rosen's tortious interference claim still would not pass muster and withstand summary judgment because there was no genuine issue of material fact concerning

---

[2] At oral argument, the parties disputed whether the terminable-at-will provision of the 2002 Agreement also rendered the agreement illusory. Ordinarily, a terminable-at-will provision would render contractual promises illusory and the contract would thus be unenforceable for lack of consideration. Glascock v. Comm'r of Internal Revenue, 104 F.2d 475, 476 (4th Cir. 1939); see also RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a (1981) (stating that "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise" and, instead, constitute an illusory promise). A notice provision, however, limits the right to cancel and constitutes sufficient consideration to prevent a contract from being illusory. See Am. Gen. Life & Accident Ins. Co. v. Ward, 429 F.3d 83, 91 n.5 (4th Cir. 2005). Although the 2002 Agreement contained a ten-day notice provision, this provision failed to create a justified expectation of performance because there was no meeting of the minds as to the essential elements of the underlying agreement, resulting in a failure to execute an enforceable contract in the first instance.

the element of "absence of justification." Absence of justification means conduct that is carried out for an improper purpose, such as malice or spite, or through improper means, such as violence or intimidation. <u>Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co.</u>, 992 F.2d 59, 62 (4th Cir. 1993) (applying South Carolina law). A party is justified, however, when acting in the advancement of its legitimate business interests or legal rights. <u>Webb</u>, 418 S.E.2d at 561. Furthermore, as long as some legitimate purpose or right exists, the improper purpose must predominate in order to create liability. <u>Crandall Corp. v. Navistar Int'l Transp. Corp.</u>, 395 S.E.2d 179, 180 (S.C. 1990).

Rosen has not offered any evidence that BMW utilized any "improper means," such as violence, threats, bribery, fraud, misrepresentation, deceit, or duress, to interfere in his relations with Clemson. <u>See</u> <u>Waldrep Bros.</u>, 992 F.2d at 63 (suggesting that such actions would constitute "improper means"). Conceding that BMW did not utilize "improper means," Rosen nonetheless maintains that BMW's conduct was carried out for an "improper purpose." In particular, he argues that BMW's only interest was to decouple Rosen from his property so that BMW could assume full control over the project. This alleged interest, however, does not exhibit the requisite malice or spite to constitute an improper purpose.

14

Moreover, even if we assume an improper purpose, BMW still could not be held liable because the improper purpose would not predominate over BMW's legitimate purpose. At all times, BMW acted in pursuit of its legitimate interests in founding an educational partnership with Clemson. As the sponsor of the GEC under the Bond Act, BMW was an indispensable participant in the establishment of the graduate institution. Contrary to Rosen's assertions, BMW thus remained motivated by a legitimate desire to find a suitable location for the GEC and retained a legitimate interest in Clemson's land acquisition negotiations that pertained to the GEC.

In sum, given that Rosen and Clemson never reached a meeting of the minds on all the essential terms and BMW's conduct did not involve any improper means or purpose, Rosen has not presented evidence sufficient to create a genuine issue of material fact concerning "the existence of the contract" or "the absence of justification." The district court thus properly granted summary judgment in favor of BMW on the claim of tortious interference with contract.

B.

Rosen's second cause of action asserted that, even if the 2002 Agreement failed to create a valid and enforceable contract, it nonetheless represented an expectancy with which BMW interfered. The execution of the 2003 Agreement, however,

15

renders this argument meritless. Therefore, the district court's grant of summary judgment was proper.

To assert a claim of tortious interference with prospective contractual relations, the plaintiff must prove that the defendant: (1) intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff. Crandall, 395 S.E.2d at 180. A claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party. See Egrets Pointe Townhouses Prop. Owners Ass'n, Inc. v. Fairfield Cmtys., Inc., 870 F. Supp. 110, 116 (D.S.C. 1994). Under South Carolina law, it is irrelevant that a plaintiff could have realized a better deal "but for" the actions of the defendant because the term "potential" contractual relations does not mean "full" contractual relations. See id. At the core, a cause of action for interference with prospective contractual relations will thus lie only where "the aggrieved party [was] . . . unsuccessful in acquiring an expected contract due to a third party's intentional and wrongful actions." Id.

In light of this standard, Rosen cannot assert a viable claim for interference with prospective contractual relations because Rosen's execution of the 2003 Agreement, which expressly terminated the 2002 Agreement for all purposes, precluded any

16

claim he otherwise would have had. See id. (holding that "[b]ecause there was a valid contract in existence [between plaintiff and another party] at the inception of this action, . . . the existence of that contract precludes any recovery on a claim for interference with prospective contractual relations."). Similarly, Rosen cannot recover on a theory that the 2003 Agreement was less profitable to him than it would have been without BMW's interference. See id.

As previously explained, moreover, Rosen has not demonstrated that BMW acted for an improper purpose or utilized improper methods, which is a necessary element of an intentional interference with prospective contractual relations claim. Crandall, 395 S.E.2d at 180. Consequently, viewing the evidence in the light most favorable to Rosen and taking his allegations as true, there is no genuine issue of material fact and the district court properly granted summary judgment in favor of BMW on the claim of intentional interference with prospective contractual relations.

C.

Rosen's third cause of action alleged that BMW engaged in a civil conspiracy with agents and representatives of Clemson and the State of South Carolina. Under South Carolina law, a civil conspiracy claim contains the following elements: (1) a combination of two or more persons, (2) for the purpose of

17

injuring the plaintiff, (3) which causes the plaintiff special damage. <u>Lee v. Chesterfield Gen. Hosp. Inc.</u>, 344 S.E.2d 379, 382 (S.C. 1986) (citations omitted). The difference between civil and criminal conspiracy is that "in criminal conspiracy the agreement is the gravamen of the offense, whereas in civil actions, the gravamen of the tort is the damage resulting to plaintiff from an overt act done pursuant to a common design." <u>Vaught v. Waites</u>, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989) (citation omitted). To recover on a civil conspiracy claim, the plaintiff must therefore demonstrate that the "object of the conspiracy was to ruin or damage the business of another." <u>Waldrep Bros.</u>, 992 F.2d at 63.

In this case, there is no genuine issue of material fact because the record is devoid of any evidence suggesting a conspiracy. Indeed, no facts have been presented that could lead a court to conclude that BMW's objective was to injure Rosen's business. Although Rosen claims that there were meetings, telephone calls, and emails exchanged between BMW, AMREC, and AMREC's attorneys plotting ways to leverage him to give up his property and contract rights, such claims are insufficient. Rosen has not provided a scintilla of evidence that would suggest that BMW possessed the requisite motive to injure. Rather, the record indicates that BMW was motivated by its desire to establish the GEC, which in and of itself does not

18

imply an explicit desire to damage Rosen's business. The only harm that BMW may have intended to cause Rosen was the incidental harm to a competitor that is necessarily part of all legitimate business competition.

That increased benefits for one entity may come at the expense of a competing entity is merely a fact of life in a market economy. Id. Consequently, although a party cannot interfere with a contract because of malice or spite, it is altogether legitimate for BMW to engage in business competition with Rosen's entities. See RESTATEMENT (SECOND) OF TORTS § 768 (1979) ("One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if . . . his purpose is at least in part to advance his interest in competing with the other.").[3] Sanctioning BMW for obtaining a contract with Clemson would thus unjustly punish BMW and Clemson. The evidence in this case demonstrated that Clemson terminated its

---

[3] Granted, if Rosen and Clemson had executed a contract that was not terminable at will, there would be "established interests that are not subject to interference on the basis of competition alone." RESTATEMENT, supra, § 768 cmt. a. However, where the contract at issue is terminable at will, competition is not an improper basis for interference. See RESTATEMENT, supra, § 768 cmt. i ("If the third person is free to terminate his contractual relation with the plaintiff when he chooses, . . . any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them.").

2002 Agreement with Rosen because of its dissatisfaction with the progress and development of the wind tunnel project and its reasonable belief that the GEC did not require a wind tunnel. Punishing BMW under these facts would not only undermine BMW's legitimate business negotiations, but also effectively deprive Clemson of its entitlement to seek out those ventures most aligned with its institutional goals.

Furthermore, fatal to Rosen's claim for civil conspiracy against BMW is the fact that he has not adequately alleged special damages in connection with the claim. Under South Carolina law, the damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting from the other claims. See Vaught, 387 S.E.2d at 95. Rosen therefore must allege and prove damages that occurred as a result of the alleged conspiracy itself, in addition to any damages alleged as a result of any other claims. See id. Here, the damages sought for conspiracy, namely loss of profits and loss of development and management fees, are identical to the damages sought in Rosen's other causes of action. We therefore affirm the district court's grant of summary judgment in favor of BMW with respect to the claim of civil conspiracy.

20

## IV.

Viewing the record as a whole and in the light most favorable to the nonmoving party, we conclude that there is no genuine issue as to any material fact and that BMW is entitled to a judgment as a matter of law. Accordingly, we affirm the district court's order granting summary judgment.

<u>AFFIRMED</u>