**RLM COMMUNICATIONS, INC., Plaintiff,**

v.

**Amy E. TUSCHEN and Escience and Technology Solutions, Inc., Defendants.**

**No. 5:14–CV–250–FL.**

United States District Court, E.D. North Carolina, Western Division.

Signed Nov. 7, 2014.

Unsealed Nov. 25, 2014.

Jose A. Coker, R. Jonathan Charleston, The Charleston Group, Coy E. Brewer, Jr., Coy E. Brewer, Attorney at Law PLLC, Dharmi B. Tailor, The Charleston Group, Fayetteville, NC, for Plaintiff.

Michael C. Lord, Williams Mullen, Raleigh, NC, for Defendants.

## ORDER

### (SEALED) [1]

LOUISE W. FLANAGAN, District Judge.

This matter comes before the court on defendants' motion for summary judgment (DE 6), and plaintiff's motion for permanent injunction (DE 17). Also before the court is plaintiff's response to the court's order to show cause (DE 60) with respect to costs incurred in connection with defendant's motion to compel (DE 42). The motions have been fully briefed. In this posture, the issues raised are ripe for adjudication. For the following reasons, the court grants defendants' motion, denies plaintiff's motion, and orders payment of costs in part as set forth herein.

## STATEMENT OF THE CASE

Plaintiff filed suit in state court on April 17, 2014, seeking injunctive relief and damages against defendant eScience and Technology Solutions, Inc., ("eSTS") and defendant Amy E. Tuschen ("Tuschen"), who is an employee of eSTS and a former employee of plaintiff. Plaintiff asserts nine claims for relief based upon defendants' allegedly improper use of confidential information and trade secrets: (1) breach of contract covenant not to compete, (2) breach of contract confidentiality agreement, (3) unfair and deceptive trade practices, (4) tortious interference with contractual relations, (5) misappropriation of trade secrets, (6) unjust enrichment, (7) civil conspiracy, (8) preliminary and permanent injunction, and (9) conversion.

The day after the complaint was filed, plaintiff obtained a temporary restraining order in state court. On April 25, 2014, defendants removed to this court on the basis of diversity jurisdiction. Defendants filed a motion to dismiss part of plaintiff's claims on April 27, 2014, and plaintiff filed an emergency motion for temporary restraining order on April 28, 2014. By text order entered April 29, 2014, this court granted the temporary restraining order on the terms and conditions set forth in the state court order.

That same date, plaintiff filed a second emergency motion to temporary restraining order, preliminary injunction, and to expedite discovery (DE 17). The court held an administrative conference on April 30, 2014, and, based upon discussion at the

---

**1.** Where discovery was conducted pursuant to a protective order, certain filings on which the parties rely in furtherance of their motions were sealed. Within fourteen (14) days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, a redacted copy of this sealed order will be made a part of the public record.

conference, the court directed the parties to tender a proposed consent order regarding temporary injunctive relief and case scheduling. Upon notice of the parties' respective positions, the court entered a preliminary injunction order on May 14, 2014, in part based upon consensus of the parties, and also based upon findings of fact and conclusions of law. Through scheduling order entered the same date, the court converted plaintiffs emergency motion into a motion for permanent injunction, and converted defendants' motion to dismiss into a motion for summary judgment to be supplemented upon further discovery and briefing as scheduled by the court.

Defendants alerted the court of a discovery dispute on May 27, 2014, and hearing was held before a magistrate judge partially resolving issues presented. Defendants filed a motion to compel on May 30, 2014, and an amended motion to compel on May 31, 2014 (DE 39, 42). Plaintiff filed a motion for protective order on June 13, 2014. The court stayed briefing on the dispositive motions in the case, and held motion hearing on June 16, 2014, whereupon the court granted the motion to compel and entered plaintiffs proposed protective order. Memorializing rulings at the June 16, 2014, hearing, the court set a revised briefing schedule on dispositive motions, and directed plaintiff to show cause why it should not pay defendants' costs incurred in connection with the motion to compel. Plaintiff filed a response to the show cause order on July 3, 2014, and the parties completed briefing on the dispositive motions on July 11, 2014.

## STATEMENT OF FACTS

Viewing the evidence in the light most favorable to plaintiff, the material facts may be summarized as follows. Plaintiff is a North Carolina corporation with offices in North Carolina and Georgia. Plaintiff specializes in a variety of business services related to information technology, including information assurance; cyber security; infrastructure library and service-level management implementation; systems integration and audio visual support; and program management and staff support services.

On June 5, 2007, defendant Tuschen executed an employment agreement accepting plaintiff's offer of employment as a Training and Development Representative. On her first day at work, on June 14, 2007, defendant Tuschen executed a covenant not to compete, stating that while employed and for one year thereafter she would not "directly or indirectly participate in a business that is similar to a business now or later operated by [plaintiff] in the same geographical area," among other restrictions. (DE 1–1 at 21). That same date, defendant Tuschen also executed a confidentiality agreement, stating that she would not "remove or copy any confidential information or materials" that she may have access to in her employment without plaintiff's permission, among other restrictions. (DE 1–1 at 23).

Plaintiff promoted defendant Tuschen several times during her employment with plaintiff, to positions including technical trainer, program manager, director of training operations, and director of information assurance. In each of her positions with plaintiff, defendant Tuschen was involved with oversight and provision of services to the United States government, including pursuant to a contract to provide information technology training to the United States Army, numbered W91249–12–C–0017 (the "Contract"), the term of which expired June 30, 2014. At times during the course of her employment, defendant Tuschen had access to and acquired for purposes of performing her

duties information not available to the public regarding plaintiff's business strategies and resources for bidding on government contracts, including the Contract.

Around June 1, 2013, defendant Tuschen notified plaintiff of her resignation, effective June 13, 2013. She informed plaintiff and her co-workers before leaving that she intended to take a position with defendant eSTS. Prior to her last day, defendant Tuschen gathered data related to management and operations under the Contract and copied it onto a compact disc (CD). Defendant Tuschen gave the CD to her successor program manager on the Contract, plaintiff's employee Dennis Yelverton, before her last day. Plaintiff subsequently took possession of the CD.

Defendant Tuschen began employment with defendant eSTS on or shortly after June 13, 2013. Defendant eSTS is a South Carolina corporation with offices in South Carolina, Georgia, Virginia, and Maryland. Defendant eSTS is a business engaged in engineering and management support services, including through contracts with the United States government. Defendant eSTS employs defendant Tuschen as Director of Cyber and IT Solutions in the company's Augusta, Georgia, office. During the course of her employment with defendant eSTS, defendant Tuschen has been involved with developing a bid for a government contract (the "follow-on contract") involving services similar to that provided by RLM under the Contract. The time period for bids on the follow-on contract originally was set to close in June 2014, but since was extended to October 24, 2014. Defendant Tuschen also has assisted eSTS during the course of her employment with soliciting employees of RLM to work for eSTS, in the event eSTS has the winning bid on the follow-on contract.

## DISCUSSION

### A. Motion for Summary Judgment

#### 1. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party then affirmatively must demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. Similarly, "[c]redibility determinations ... are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Id.; see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be

viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, ... and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir.1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the nonmoving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir.2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. *Id.* at 489–90.

### 2. Analysis

#### a. Breach of Contract Covenant Not to Compete

Defendants argue that plaintiff's first breach of contract claim fails as a matter of law because the covenant not to compete upon which it is based is invalid and unenforceable, due to lack of consideration, among other deficiencies. Because the court agrees that the covenant not to compete is unenforceable due to lack of consideration, the court need not reach defendants' remaining arguments in support of summary judgment on this claim.

■ Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir.2011) (quotations omitted). "[I]n order for a contract to be enforceable it must be supported by consideration. A

mere promise, without more, is unenforceable." *Investment Properties of Asheville, Inc. v. Norburn*, 281 N.C. 191, 195, 188 S.E.2d 342 (1972).

■ Where a covenant not to compete is entered into at the time and as a part of a contract of employment, the "mutual promises of employer and employee furnish valuable considerations each to the other for the contract." *James C. Greene Co. v. Kelley*, 261 N.C. 166, 168, 134 S.E.2d 166 (1964); *see Am. Hot Rod Ass'n, Inc. v. Carrier*, 500 F.2d 1269, 1277 (4th Cir.1974) (stating that covenant not to compete may be enforceable if "entered into at the time and as a part of the contract of employment," among other requirements). "However, when the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon a new consideration." *Kelley*, 261 N.C. at 168, 134 S.E.2d 166.

Plaintiff asserts that the covenant not to compete is supported by consideration in two alternative respects. First, plaintiff argues that the covenant not to compete was part of defendant Tuschen's employment contract. Second, plaintiff argues that the covenant not to compete was supported by separate consideration in the form of "company private information." (DE 74 at 5). The court will address each in turn.

■ Whether the covenant not to compete was part of defendant Tuschen's employment contract turns on an antecedent question regarding the terms of the employment contract. Under North Carolina law, in order for parties to enter into a contract, "[t]he offer must be communicated, must be complete, and must be accepted in its exact terms." *Yeager v. Dobbins*, 252 N.C. 824, 828, 114 S.E.2d 820

(1960); *see Chappell v. Roth,* 353 N.C. 690, 692, 548 S.E.2d 499 (2001). "To constitute a valid contract, the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." *Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E.2d 692 (1974); *see Horton v. Humble Oil & Refining Co.,* 255 N.C. 675, 679, 122 S.E.2d 716 (1961) ("[I]t is necessary that the minds of the parties meet upon a definite proposition. There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense.").

In addition, "[i]t is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." *Carolina Power & Light Co. v. Bowman,* 229 N.C. 682, 693–94, 51 S.E.2d 191 (1949). "[W]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court." *Hagler v. Hagler,* 319 N.C. 287, 294, 354 S.E.2d 228 (1987). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." *Anderson v. Allstate Ins. Co.,* 266 N.C. 309, 312, 145 S.E.2d 845 (1966).

■ The employment agreement in this case is embodied in a written instrument, an offer letter dated May 29, 2007, accepted and executed by defendant Tuschen on June 5, 2007. The offer letter extends to defendant Tuschen "an offer of employment effective on 14 June 2007," including terms of salary, benefits, work hours, position title, travel requirements, and employment supervision. (DE 1–1 at 19). The offer letter states that the offer is contingent in two respects: 1) on final execution of a contract with the government in support to the Leader College of Information Technology, United States Army Signal Center, Fort Gordon, Georgia; and 2) on securing and maintaining a personnel security clearance, if needed. No mention is made of any covenant not to compete requirement. The offer letter concludes by stating "[y]our signature and date constitutes 'Full' acceptance of this job offer." (*Id.*). Defendant signed and dated the letter June 5, 2007.

The valid employment agreement is contained within the four corners of this offer letter and acceptance, and its terms are plain and unambiguous. It does not state or suggest that any covenant not to compete will be a part of the employment agreement. Nor does it make the employment agreement contingent upon signature of a covenant not to compete, and the absence of such contingency is further highlighted by the two items which are expressly noted as contingencies. The limited terms of the employment agreement are further confirmed by the statement that defendant Tuschen's signature and date constitutes " 'Full' acceptance of [the] job offer." (DE 1–1 at 20). In sum, by its terms, the employment agreement does not include a covenant not to compete.

Furthermore, the covenant not to compete, executed June 14, 2007, itself makes clear that it is a separate, independent, agreement. It states that "[t]his agreement is between [plaintiff], Employer, and [defendant Tuschen], Employee," at the outset indicating that an employer-employee relationship has already been established. (DE 1–1 at 24). It recites separate consideration in the form of provision of "Company Private Information," and it confirms that the covenant not to compete "is the entire agreement between the parties." (*Id.*). In addition, the covenant not to compete was executed seven days after defendant Tuschen executed the employment agreement. Thus, the covenant not

to compete was not entered into at the time of nor made part of the employment agreement.

Plaintiff argues that the employment agreement included the covenant not to compete because the offer of employment states that it is an "offer of employment effective on 14 June 2007." (DE 65 at 16). Plaintiff suggests that because defendant Tuschen started employment on June 14, 2007, and because she signed the covenant not to compete on that day, a factual dispute is raised as to whether the covenant not to compete is part of the employment agreement. The inferences plaintiff seeks to draw from these facts, however, are unreasonable and contrary to the plain language of the employment agreement and covenant not to compete. As noted above, the employment agreement states that defendant Tuschen's signature and date constitutes " 'Full' acceptance of [the] job offer," and the employment agreement was not contingent in any respect upon signature of the covenant not to sue on the first day at work. (DE 1–1 at 20). The fact that the offer letter extended an "offer of employment effective on 14 June 2007," in itself, does not alter the execution and thus completion of the employment agreement on June 5, 2007.

*Worth Chemical Corp. v. Freeman,* 261 N.C. 780, 136 S.E.2d 118 (1964), is a useful case for comparison. There, a corporation engaged defendant as a salesman on September 1, 1960. *Id.* at 780, 136 S.E.2d 118. "Thereafter on September 16, 1960, the parties signed an employment contract which recited" a covenant not to sue. *Id.* The Supreme Court held that the covenant not to sue was invalid because it was not supported by "new consideration." *Id.* at 781, 136 S.E.2d 118. In so holding, the court noted "[a]t the time the relationship of employer and employee was established between the plaintiff and defendant [ ] on

September 1, 1960, no written contract evidenced a covenant restricting [defendant's] right to engage in competitive employment." *Id.* The court noted that "[t]he written contract of September 16, 1960 was a new contract without a new consideration." *Id.*

The same reasoning applies in the case at bar, where the earlier contract for employment did not evidence in any respect a covenant not to compete. The facts in the present case are further decisive because the earlier contract for employment is spelled out in plain and unambiguous terms in the offer letter accepted by defendant Tuschen. *Worth,* thus, is controlling.

Plaintiff also suggests that extrinsic evidence regarding the circumstances surrounding the execution of the employment agreement and covenant not to sue could shed light on whether the parties intended to incorporate the covenant not to sue into the employment agreement. But parol evidence may be used to determine the intent of the contracting parties only if the contract's language is ambiguous. *See Lattimore v. Fisher's Food Shoppe, Inc.,* 313 N.C. 467, 474, 329 S.E.2d 346 (1985). Where the terms of both agreements are plain and unambiguous as discussed above, recourse to extrinsic evidence to define the meaning of terms in the contracts is not permitted. *See Mobil Oil Corp. v. Wolfe,* 297 N.C. 36, 39, 252 S.E.2d 809 (1979).

In sum, because the covenant not to compete is not included within the employment agreement between plaintiff and defendant Tuschen, the covenant must be supported by "new consideration" to be valid. *Kelley,* 261 N.C. at 168, 134 S.E.2d 166. Accordingly, the court turns next to plaintiff's alternative contention that the covenant was supported by consideration in the form of provision of "company private information." (DE 74 at 5).

"[C]onsideration may present itself in any of numerous different shapes or guises, but in some form or other it must be present there must be either some advantage, or presumed or assumed advantage, accruing to party who yields his claim, or some detriment to the other party." *Bizzell v. Bizzell,* 247 N.C. 590, 603, 101 S.E.2d 668 (1958). Consideration may be "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Brenner v. Little Red Sch. House, Ltd.,* 302 N.C. 207, 215, 274 S.E.2d 206 (1981).

Nevertheless,. "[c]onsideration which may be withdrawn on a whim is illusory consideration which is insufficient to support a contract." *Kadis v. Britt,* 224 N.C. 154, 163, 29 S.E.2d 543 (1944); *see, e.g., Milner Airco, Inc. of Charlotte, NC v. Morris,* 111 N.C.App. 866, 870, 433 S.E.2d 811 (1993) (holding that where a "contract itself, while reciting consideration, actually does not bind the employer to any promise," the "purported consideration was illusory at best"). "An apparent promise which, according to its terms, makes performance optional with the promisor . . . is in fact no promise. Such an expression is often called an illusory promise." *Bowman v. Hill,* 45 N.C.App. 116, 117–18, 262 S.E.2d 376 (1980) (quoting Williston, Contracts § 1A (3d ed.1957)); *see also BCD LLC v. BMW Mfg. Co., LLC,* 360 Fed. Appx. 428, 435 (4th Cir.2010) (" '[W]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise' and, instead, constitute an illusory promise.") (quoting Restatement (Second) of Contracts § 77 cmt. a (1981)); *Elmore v. Cone Mills Corp,* 23 F.3d 855, 870 (4th Cir.1994) (same) (quoting 1 Lord, Williston on Contracts § 1:2).

With respect to consideration, the covenant not to compete states, in pertinent par, that "[i]n consideration of Employer's providing Employee with Company Private Information, Employee agrees as follows . . . ." (DE 1–1 at 21). Plaintiff, however, has not identified any company private information that it provided Tuschen upon execution of the covenant not to sue, nor any company private information that it was required to provide to Tuschen.

Indeed, the confidentiality agreement, which defendant Tuschen executed on the same date, states similarly that "[i]n consideration of Employer's providing Employee with company private information, Employee agrees as follows . . . ." (DE 1–1 at 23). This agreement makes clear that provision of such company private information is optional with the Employer. In particular it states:

I [defendant Tuschen] acknowledge that Employer *may disclose* to me or give me access to confidential information so that I may perform my employment duties. I agree that the confidential information includes Employer's trade secrets, sales and profit figures, customer lists, relationships with contractors, customers, or suppliers, and opportunities for new or developing business. The confidential information *may be obtained* in written materials . . . . It *may also consist of* unwritten knowledge . . . .

(DE 1–1 at 23 (emphasis added)). In this manner, the provision of company private information, whether as consideration for the covenant not to compete or the confidentiality agreement, is an "apparent promise" which makes performance optional with plaintiff. *Bowman,* 45 N.C.App. at 117, 262 S.E.2d 376. Such a contract, "while reciting consideration, actually does not bind the employer to any promise," and thus the "purported consideration was illusory at best." *Milner,* 111 N.C.App. at

870, 433 S.E.2d 811; *see Kadis,* 224 N.C. at 163, 29 S.E.2d 543.

Plaintiff suggests that the recited consideration was adequate because defendant Tuschen "in fact received company private information such as target markets and executive strategy information of potential customers." (DE 74 at 5). For example, defendant Tuschen testified that she had "executive strategy sessions for the directors to attend to find out what targets of opportunities we would be pursuing." (DE 75 at 88).[2] When she was a "capture manager," she "attended maybe biannually strategy sessions with the directors and above and ... would discuss where we are with regard to our growth...." (*Id.* at 89).

But whether defendant Tuschen in fact received such company private information is irrelevant to whether the covenant not to sue obligated plaintiff to provide the information. The covenant did not bind plaintiff to provide defendant Tuschen with company private information, and the confidentiality agreement confirms that provision of such company private information as "customer lists ... and opportunities for new or developing business" was optional. Furthermore, at the time she was hired, defendant Tuschen began in the non-management position of Training & Development Representative (which defendant Tuschen described as an "instructor" position), and defendant Tuschen only was promoted to management level positions later in her employment. (DE 1–1 at 19; DE 63 at ¶ 2 DE 65 at 6, n. 2). No guarantee of such promotions, nor the access to company private information at the management level, as defendant Tuschen describes in her testimony, is stated in defendant Tuschen's employment agreement nor the covenant not to compete.

(*See* DE 63 at ¶ 6–7 (noting that her duties as Training & Development Representative did not involve receipt of trade secret or confidential information, and that she was not presented with any new agreement upon promotion to management-level positions)).

In sum, where the covenant not to compete states consideration which is optional, not binding, and which may be withdrawn, the consideration is illusory and insufficient to support a contract. *See Kadis,* 224 N.C. at 163, 29 S.E.2d 543; *Milner,* 111 N.C.App. at 870, 433 S.E.2d 811; *BCD LLC,* 360 Fed.Appx. at 435. Thus, the covenant not to compete is not enforceable, and plaintiff's first claim for breach of contract fails as a matter of law.

### b. Breach of Contract Confidentiality Agreement

Defendants argue that plaintiff's second breach of contract claim fails, in pertinent part, for the same reason as plaintiff's first claim, due to lack of valid consideration, among other deficiencies. Like the covenant not to sue, the confidentiality agreement recites the same invalid consideration as the covenant not to compete. (DE 1–1 at 23). In addition, like the covenant not to sue, the confidentiality agreement was not made part of the employment agreement. (*See* DE 1–1 at 19–20). Therefore, plaintiff's second breach of contract claims fails for the same reasons as plaintiff's first claim, due to lack of valid consideration. *See Kelley,* 261 N.C. at 168, 134 S.E.2d 166; *Kadis,* 224 N.C. at 163, 29 S.E.2d 543; *Milner,* 111 N.C.App. at 870, 433 S.E.2d 811; *BCD LLC,* 360 Fed.Appx. at 435.

---

**2.** Where this order cites to deposition transcripts, as opposed to other briefs and materials in the record, page numbers designated in such citations are those specified on the deposition transcript itself, not the page number automatically stamped upon docketing.

### c. Tortious Interference with Contract

■■ Plaintiff's tortious interference with contract claim against defendant eSTS is based upon defendant eSTS's alleged interference with the covenant not to compete, the confidentiality agreement, and plaintiff's employment agreement with defendant Tuschen. (DE 1–1 at 9–10). As an initial matter, because the covenant not to compete and confidentiality agreement are invalid, plaintiff's interference claim on the basis of these two agreements fails as a matter of law. *See Embree Const. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916 (1992) (stating that a claim for tortious interference with contract requires "a valid contract between the plaintiff and a third person") (internal quotations omitted).

■■ Plaintiff's interference claim on the basis of the employment agreement, the validity of which is not disputed, requires further analysis. Under North Carolina law, the elements of tortious interference with contract are:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Embree*, 330 N.C. at 498, 411 S.E.2d 916 (internal quotations omitted). Defendant argues that there is no genuine issue of material fact that defendant acted with justification as a competitor.

■■ "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Id.* (internal quotations omitted). The North Carolina Supreme Court has held that hiring of a competitor's employee, where the employee is working under an at will employment contract, cannot form the basis of a claim for tortious interference with contract. In particular, in *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647 (1988), the court held that a plaintiff former employer did not state a claim for tortious interference with contract where defendant had only "offered the plaintiff's employees job opportunities which induced them to terminate their terminable at will contracts and, by locating these employees in their previously assigned territories, induced them to breach the non-competition clauses contained in their contracts with the plaintiff." 322 N.C. at 221, 367 S.E.2d 647. The court concluded that "the hiring and placing of the plaintiff's former employees by the defendant for the purpose of developing the territory assigned to him by a company competing with the plaintiff amounted to justifiable interference." *Id.* at 222, 367 S.E.2d 647. In so concluding, the court recognized that "public policy demands that absent some monopolistic purpose everyone has the right to offer better terms to another's employee, so long as the latter is free to leave." *Id.*

*Peoples* controls the outcome here, where the sole remaining basis for plaintiff's tortious interference of contract is the at will employment agreement with defendant Tuschen. There is no genuine issue of fact that plaintiff and defendant eSTS are competitors in the same field, and that eSTS hired Tuschen to work on government contracts similar to those that she worked on with plaintiff. (*See e.g.* DE 65 at 7 (asserting that defendant Tuschen's actions upon employment with eSTS "benefit[ted] [eSTS] in the competition for the follow-on Contract, in particular, and RLM's business, in general); DE 75 at 97–98). This direct competition provided justification for any interference with plain-

tiff's at will employment contract with defendant Tuschen.

In sum, plaintiff's claim for tortious interference with contract fails as a matter of law on the basis of the competitive relationship between plaintiff and defendant eSTS.

d. Misappropriation of Trade Secrets

Plaintiff's misappropriation claim is based upon defendant Tuschen's alleged acquisition and use of plaintiff's trade secrets, including business strategies, contract price information, and employee lists. Plaintiff asserts damages as a result of the alleged misappropriation and seeks permanent injunctive relief to prevent further loss. Defendant argues that there is no evidence that defendant Tuschen misappropriated any trade secrets, nor evidence of any damages resulting from misappropriation.

■ A claim for misappropriation of trade secrets is a statutory claim under North Carolina law. Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both:

> (1) Knows or should have known of the trade secret; and
>
> (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C. Gen.Stat. § 66–155. "Trade secret" means "business or technical information" that:

> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 66–152(3). "Misappropriation" means "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.* § 66–152(1).

The statute authorizes "actual damages" as well as preliminary and permanent injunctive relief. *Id.* § 66–154(a) & (b). In particular, "actual or threatened misappropriation of a trade secret ... shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists plus an additional period as the court may deem necessary under the circumstances to eliminate any inequitable or unjust advantage arising from the misappropriation." *Id.* § 66–154(a).

Plaintiff asserts several categories of trade secrets were misappropriated by defendant Tuschen. The court will address each in turn.

### i. CD

■ As described in the summary of the facts, prior to her last day, defendant Tuschen gathered data related to management and operations under the Contract and copied it onto a compact disc (CD). Defendant Tuschen gave the CD to her successor program manager on the Contract, plaintiff's employee Dennis Yelverton, before her last day. Plaintiff subsequently took possession of the CD.

With respect to the information on the CD, plaintiff asserts that the CD contained "an extensive amount of information from [defendant Tuschen's] laptop," which information she used in the course of her em-

ployment duties at RLM. (DE 65 at 31). Plaintiff asserts that the CD thus contained a large amount of confidential information related to the Contract and RLM's business strategy, including, for example, a "500–day Plan (15 January 2013)," a "Business Development Manual (2011)," a "Proposal Development Checklist (2012)," and an "Executive Strategy Session (15 January 2013)." Plaintiff asserts that the information on the CD thus was not available to the public and a trade secret.

Defendant Tuschen does not dispute, and the court assumes for purposes of this decision, that the information on the CD was not available to the public, and meets the definition of a "trade secret." Plaintiff thus forecasts evidence that defendant Tuschen at least "should have known of the trade secret," the first element of a trade secret misappropriation claim. *See* N.C. Gen.Stat. § 66–155(1). Defendant Tuschen disputes, however, that she misappropriated any of the information on the CD or that any damages resulted from the misappropriation.

To constitute misappropriation of a trade secret, defendant must have "had a specific opportunity to acquire it for disclosure or use," or "has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen.Stat. § 66–155(2). Here, defendant Tuschen had access to the information on the CD because it was on her work laptop, which she used during the course of her employment. (*See* DE 67–6 at 115–16). After copying the information from her work laptop to the CD, she gave the CD to another RLM employee, Yelverton. (*See id.*). Plaintiff introduces no evidence that defendant Tuschen did anything with the CD other than give it to Yelverton.

Plaintiff seeks to have the court find reasonable an inference that defendant Tuschen somehow must have also further copied the CD, or taken data or documents that were on it, with her upon leaving employment with RLM. (See DE 65 at 36; DE 74 at 13). The circumstances of this case, and the evidence of record, however, do not permit such an inference.

Plaintiff suggests, for example, that defendant Tuschen must have taken information on the CD because eSTS did "not have core competencies in this area [of the Contract] prior to the hiring of Tuschen," and that eSTS is "now a competitive bidder in an area it was never competent in before." (DE 65 at 37). This may very well be true, but such facts reasonably do not permit the inference that defendant Tuschen took a copy of the CD (or the actual information on the CD) with her when she left employment with RLM. Rather, these assertions, considered in conjunction with the evidence as a whole, suggest at most that defendant Tuschen gained knowledge and experience from working with RLM that she then brought with her to eSTS.

Acquiring and using such knowledge and experience, however, does not constitute misappropriation of trade secrets under North Carolina law. *See Engineering Associates, Inc. v. Pankow,* 268 N.C. 137, 139, 150 S.E.2d 56 (1966) ("[W]here a person in his new employment undertakes to use the knowledge acquired in the old, it is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory.") (internal quotations omitted); *see also Asheboro Paper & Packaging, Inc. v. Dickinson,* 599 F.Supp.2d 664, 677 (M.D.N.C. 2009) ("Under North Carolina law, customer information maintained in the memory of a departing employee is not a trade secret."); *Travenol Labs., Inc. v. Turner,* 30 N.C.App. 686, 695–96, 228 S.E.2d 478 (1976) (holding that an injunction restricting misappropriation of trade secrets

should not be "so broad that the defendant [former employee] may be deprived of the right to use his own skills and talents in this work for [the new employer]").

Plaintiff also suggests that defendant Tuschen must have taken information on the CD because of the circumstances surrounding her copying of the information on the CD. For example, plaintiff notes that no one asked or authorized defendant Tuschen to develop the CD, and its development was unnecessary because her company laptop contained all the information on the CD. (DE 74 at 13). The inferential link, however, between the circumstances of the creation of the CD and a conclusion that defendant Tuschen further copied or took information on the CD, is too attenuated. As an initial matter, it is undisputed that defendant Tuschen as Director of Information Assurance herself had authority over management of the Contract. (DE 63 ¶¶ 7, 24, 28). Plaintiff offers no evidence to counter defendant Tuschen's averments that she created the CD and gave it to her successor managing the Contract during a two week notice period in order to ensure a smooth transition in the management of the Contract. (*Id.* at ¶ 25; DE 77 at ¶¶ 12–13). While plaintiff criticizes the manner in which defendant Tuschen transmitted this information to Yelverton, it remains undisputed that the information remained with Yelverton for work on the Contract and it eventually was retained by plaintiff. (DE 63 at ¶ 32; DE 79 at ¶ 12).

In light of the circumstances of this case, the court finds distinguishable *Medi-cal Staffing Network, Inc. v. Ridgway*, 194 N.C.App. 649, 670 S.E.2d 321 (2009), upon which plaintiff relies in support of its claim. In *Ridgway*, the North Carolina Court of Appeals upheld a trial court's determination to allow a misappropriation claim to proceed to trial where a manager in a nurse-staffing company "accessed [plaintiff's] 'game plan' and other confidential documents from [plaintiff's] network with unusual frequency," including "shortly before" a meeting with a competitor nurse-staffing company, and "repeatedly" thereafter. 194 N.C.App. at 659, 670 S.E.2d 321. In the case at bar, by contrast, plaintiff points to only one instance in which defendant Tuschen copied information from her computer onto the CD, which she then provided to plaintiff's own employee for purposes of transitioning contract management. The circumstances here, in contrast to *Ridgeway*, do not permit an inference of misappropriation.

In sum, plaintiff has not forecasted evidence permitting an inference that defendant Tuschen misappropriated trade secrets by taking and using information contained on the CD.

In addition, and in the alternative, to the extent some aspect of defendant Tuschen's creation of the CD constituted misappropriation of trade secrets,[3] plaintiff has not forecasted evidence sufficient to permit an inference of actual damages or entitlement to injunctive relief.

In order to obtain actual damages, a plaintiff must demonstrate that a defendant's misappropriation of trade secrets

---

3. For instance, although plaintiffs brief does not make this clear, plaintiff suggests that defendant Tuschen's act of copying the information from her laptop to the CD was, itself, an unlawful act of misappropriation, regardless whether she further copied it or took the data on it with her upon resigning from RLM. The court has not identified any case law confirming that such an act would itself constitute misappropriation, where the CD remains in possession of the employer. For purposes of the above discussion of damages, however, the court assumes that the mere act of copying the CD could constitute misappropriation of trade secrets.

proximately caused injury to the plaintiff. *See* N.C. Gen.Stat. § 66–154(b); *Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704 (2001) (requiring proximate cause for unfair trade practices claim under N.C. Gen. Stat. § 75–1.1, the North Carolina Unfair and Deceptive Trade Practices Act); *Drouillard v. Keister Williams Newspaper Servs., Inc.,* 108 N.C.App. 169, 173, 423 S.E.2d 324 (1992) (holding that § 75–1.1 is applicable to violations of the Trade Secrets Protection Act); *see also Static Control Components, Inc. v. Darkprint Imaging, Inc.,* 200 F.Supp.2d 541, 550 (M.D.N.C.2002) (considering whether "misappropriating [plaintiff's] trade secrets proximately caused" plaintiff's damages).

▮▮▮▮ "[I]n a long line of decisions in this circuit, [the Fourth Circuit has] emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder." *Sakaria v. Trans World Airlines,* 8 F.3d 164, 172–173 (4th Cir.1993). "This emphasis, where causation is dispositive, upon 'probability,' . . . rather than mere 'possibility' as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere 'possibilities,' by impermissible but understandable resort to such factors as sympathy and the like." *Lovelace,* 681 F.2d at 242. Proximate cause must be "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries," and such injuries were "probable under all the facts as they existed." *Hairston v. Alexander Tank & Equipment Co.,* 310 N.C. 227, 233, 311 S.E.2d 559 (1984).

▮▮▮ Plaintiff claims that, due to defendant Tuschen's misappropriation of trade secrets, it will lose the bid to the follow-on contract, or that it will otherwise lose the opportunity to bid on the follow-on contract. Whether or not plaintiff, or any other entity, could win or will win the bid for the follow-on contract, however, is speculative and dependent on multiple intervening factors that prevent a finding of proximate cause. The field of bidders, their respective capacities relative to the bidding requirements, and the presence of an objective third-party decisionmaker, in the form of the government agency evaluating bids on the follow-on contract, all introduce intervening causes for the bid award precluding a finding of proximate cause. *See, e.g., Strates Shows, Inc. v. Amusements of Am., Inc.,* 379 F.Supp.2d 817, 828 (E.D.N.C.2005) (holding that plaintiff failed to establish proximate causal connection between alleged illegal rigging of bidding process for government contract and its own failure to win the contract, where multiple intervening factors could have determined the outcome of the bid award but for the illegal rigging); *Strates Shows, Inc. v. Amusements of Am., Inc.,* 184 N.C.App. 455, 463, 646 S.E.2d 418 (2007) (same, in evaluating state law unfair and deceptive trade practices claim on identical alleged facts).

Moreover, in this instance, eSTS's appeal of the classification of the follow-on contract has resulted in disqualification of plaintiff as a bidder on the follow-on contract, providing further independent cause bearing on the outcome of any award of the follow-on contract. (*See* DE 65 at 8) ("If [eSTS's] appeal is granted, . . . RLM would no longer be able to bid.").

In an apparent effort to circumvent the intervening impact of the appeal, plaintiff suggests that the appeal itself benefitted from trade secret information provided by defendant Tuschen. But, there is no evidence that defendant Tuschen used misap-

propriated trade secrets in assisting eSTS with the appeal. At most, the evidence suggests that defendant Tuschen used her depth of knowledge and experience to "strategize and formulate the appeal." (DE 65 at 30). But, as discussed above, such knowledge and experience is not itself a trade secret. Moreover, the decision on appeal does not turn on any private information regarding a particular entity that may bid on the follow-on contract. Rather it depends on the description in the bid proposal and requirements, as well as other publicly available information. (DE 100–1 at 3–11). In any event, the decision on the appeal, like the decision on the bid itself, depends upon the independent reasoning and judgment of the decisionmaker, and thus an inference of causation is speculative and unreasonable.

In sum, whether plaintiff, or defendant eSTS, or any other entity, could or will be able to win the follow-on contract depends upon multiple intervening factors, apart from the asserted misappropriation of trade secrets. Therefore, the record does not support an inference of causation between the asserted misappropriation of trade secrets contained on the CD and plaintiff's asserted injury.

ii. RLM Employee Contact Information

 Plaintiff contends that defendant Tuschen misappropriated trade secrets pertaining to RLM employee contact information. As evidence in support of this contention, plaintiff points to a document containing RLM employee contact information, which defendant Tuschen produced in discovery, titled "Information Assurance 442nd CLC POC List" (the "POC List"). (DE 67–10 at 5–6). Plaintiff also suggests generally that defendant Tuschen must have used information about RLM employees working on the Contract in order to assist defendant eSTS with solicita-

tion of such individuals for employment at eSTS. (DE 74 at 12).

As an initial matter, the POC List is not a trade secret because it was provided to defendant Tuschen by a federal government employee working on the Contract, Joey Gaspard. (DE 63 at ¶ 22; DE 67–6 at 178). It contains work contact information (work address, phone, cell phone, and email address) about RLM employees, subcontractors, and government employees. (DE 67–6 at 179). Plaintiff suggests that defendant Tuschen must have misappropriated the POC List because it resembles a list in possession of RLM (DE 67–1 at 1–2), and because defendant Tuschen was "insensible" to request the POC Roster from the government. (DE 65 at 38). Plaintiff's suggestions, however, are beside the point. Where the information in the POC Roster readily was obtainable from the government, it was not "subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen.Stat. § 66–152(3)(b).

Plaintiff also has not demonstrated that information about RLM employees working on the Contract is a trade secret that was misappropriated by defendant Tuschen. Defendant Tuschen worked with many RLM employees staffed on the Contract as Director of Information Assurance. (DE 67–6 at 179; e.g., DE 70–14 ¶ 4; DE 70–19 ¶ 4). Moreover, information about RLM employees, such as position information, compensation information, and resumes, are available publicly or through direct communications with the employees. (DE 63 at ¶¶ 13–21; DE 70–14 ¶ 9; DE 75 at 144 & 153; DE 70–19 ¶ 8).

In any event, plaintiff has not demonstrated any injury proximately caused by misappropriation of the POC List, or otherwise information about RLM employees working on the Contract. Plaintiff claims

damages in the form of "the award of the follow-on Contract." (DE 74 at 12). As discussed above, however, award of the follow-on contract is dependent upon multiple independent factors, and any inference between such award and misappropriation of employee contact information is speculative.

### iii. RLM "White Papers" Initiative

■ Plaintiff claims that defendant Tuschen misappropriated trade secrets in the form of information about an initiative RLM was considering prior to Tuschen's resignation, which plaintiff refers to as a "white paper" initiative. As described in the evidence in the record, the "white paper" initiative was a potential business development opportunity (the details of which are not further disclosed),[4] involving production of an informational document of a certain nature. (DE 73–2 at 187–188). An outside individual, Mary Keesler, contacted defendant Tuschen and asked her if RLM was interested in pursuing the "white paper" initiative. (*Id.* at 188). Defendant Tuschen told Keesler that RLM was not interested, and suggested that eSTS may want to discuss it. (*Id.*). Plaintiff points to an email by defendant Tuschen to eSTS, dated June 11, 2013, in which defendant Tuschen states "[w]e have been in some serious discussions about getting in early to support standing up to the Cyber Center of Excellence (white paper and identifying funding stage) . . . [i]f we can execute an NDA [non-disclosure agreement] with her ASAP it would be hugely valuable. . . ." (DE 67–10 at 16).

The evidence presented does not permit reasonably an inference that information regarding the "white paper" initiative was a trade secret. As an initial matter, as

described in the evidence, it there is no identifiable "business or technical information" in the initiative that is not "readily ascertainable through independent development." N.C. Gen.Stat. § 66–152(3). Rather, the evidence describes a nebulous, potential, business opportunity, not yet realized, that is being offered by a third-party individual to RLM. Where defendant Tuschen gained knowledge of the opportunity from the outside source by having served as the contact person for RLM, this does not preclude her from using that knowledge to suggest to eSTS to pursue the same potential business opportunity.

■ In addition, the evidence does not permit an inference that RLM was damaged by any misappropriation of trade secrets from RLM in the form of information about the "white paper" initiative. Plaintiff presents no evidence that it would have pursued the "white paper" initiative presented by Keesler. Indeed, defendant Tuschen, in the only testimony on the matter, stated that "RLM wasn't interested" in the "white paper" initiative. (DE 73–2 at 188). In addition, plaintiff presents no evidence of any benefit actually received by defendant eSTS as a result of information obtained by defendant Tuschen regarding the "white paper" initiative. In sum, plaintiff has shown neither its own loss nor defendant eSTS's gain, nor any other injury, as a result of misappropriation of information related to the "white paper" initiative.

In sum, plaintiff has failed to forecast evidence permitting either an inference of misappropriation of trade secrets, or an inference of damages proximately caused by misappropriation of trade secrets. Ac-

---

**4.** In describing the initiative, defendant Tuschen states only that "[w]riting white papers are common practice in government contracting and is [sic] not a strategy unique to

RLM," and "[i]ndeed, eSTS has three white papers that are available to the public for download from its website. See http://estsi.com/about/publications." (DE 77 at 14).

cordingly, summary judgment in favor of defendants is required as to this claim.

### e. Conversion

██ Plaintiff alleges that defendant Tuschen committed the tort of conversion by taking without permission information on the CD, and converting the information to her own use. (*See* DE 1–1 at 13; DE 65 at 44). In North Carolina, conversion generally is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351 (1956) (internal quotation marks omitted). Where the court determined previously with respect to the misappropriation claim that the evidence does not permit an inference that defendant Tuschen took with her a copy of the CD, or information contained therein, plaintiff's claim of conversion also must fail for lack of "assumption and exercise of the right of ownership over goods or personal chattels belonging to another." *Peed*, 244 N.C. at 439, 94 S.E.2d 351.

Accordingly, summary judgment in favor of defendants is required as to this claim.

### f. Unfair and Deceptive Trade Practices

Plaintiff bases its Unfair and Deceptive Trade Practices claim on the same alleged conduct underlying its tortious interference with contract and misappropriation claims. (*See* DE 1–1 at 8–9; DE 65 at 42; DE 74 at 13). Therefore, where plaintiff's tortious interference with contract and misappropriation claims are without merit, summary judgment in favor of defendants is required as to this claim.

### g. Civil Conspiracy

Plaintiff bases its civil conspiracy claim on the same alleged wrongful conduct underlying its contract and misappropriation claims. (*See* DE 1–1 at 12; DE 65 at 42–43). Therefore, where plaintiff's contract and misappropriation claims are without merit, summary judgment in favor of defendants is required as to this claim.

### h. Unjust Enrichment

Plaintiff claims that defendant Tuschen was unjustly enriched by "obtain[ing] compensation and potential compensation from [eSTS] which would not have been available to her but for her unlawful conduct." (DE 65 at 43; *see* DE 1–1 at 11). Plaintiff also claims that defendant eSTS was unjustly enriched by unlawful receipt of trade secrets and access to plaintiff's employees for hire. (DE 65 at 43–44).

██ As an initial matter, plaintiff may not now assert an unjust enrichment claim against defendant eSTS, where such claim was raised only against defendant Tuschen in the complaint. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 Fed.Appx. 556, 563 (4th Cir.2008) (quotations omitted); *see also Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir.2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."). In any event, as discussed below, plaintiff's claim fails as a matter of law.

██ Unjust enrichment is based on the principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554 (1988). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party; [t]he benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that

is not justified in the circumstances; and [t]he benefit must not be gratuitous and it must be measurable." *Id.* Further, "[i]f there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Id.*

Plaintiff's unjust enrichment claim fails in several respects. First, plaintiff has not demonstrated that defendants engaged in any "unlawful conduct," as the court has found that defendants are entitled to judgment as a matter of law on all of plaintiff's claims. Second, as to defendant Tuschen, plaintiff has not asserted that it conferred a benefit on defendant Tuschen; rather, it asserts that defendant eSTS conferred a benefit on defendant Tuschen in the form of compensation and potential compensation. Third, there is a contract of employment between plaintiff and defendant Tuschen that precludes a claim of unjust enrichment based upon compensation plaintiff provided to defendant Tuschen. Finally, as to defendant eSTS, plaintiff has not demonstrated that plaintiff conferred any benefit on defendant eSTS that was measurable and not gratuitous, where plaintiff has not established misappropriation of trade secrets or damages resulting therefrom.

In sum, plaintiff's unjust enrichment fails as a matter of law, and summary judgment in favor of defendants is required as to this claim.

## B. Permanent Injunction Motion

■ Plaintiff seeks a permanent injunction on the basis that defendants continued violation of contracts, the Trade Secret Protection Act, and the Unfair and Deceptive Trade Practices Act, has caused and will continue to cause plaintiff to suffer immediate and irreparable harm to its business and the goodwill appertaining thereto, for which there is no adequate remedy at law.

■ "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief[:] A plaintiff must demonstrate[ ](1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *see also* N.C. Gen.Stat. § 66–154(a) (authorizing remedy of permanent injunctive relief "upon judgment finding misappropriation for the period that [a] trade secret exists plus an additional period as the court may deem necessary under the circumstances to eliminate any inequitable or unjust advantage arising from the misappropriation"). .

Where the court determined above that plaintiff has not established a genuine issue of material fact as to any of its substantive claims for relief, plaintiff's motion for permanent injunction on the basis of such claims must be denied. In particular, plaintiff has failed to establish that it has suffered an irreparable injury or that a remedy in equity is warranted in light of the lack of merit in plaintiff's claims. Therefore, plaintiff's permanent injunction motion must be denied.

## C. Award of Costs

Defendants seek costs associated with the filing of a second amended motion to compel on May 31, 2014. The procedural . facts pertinent to the determination of award of costs may be summarized as follows.

On May 14, 2014, the court entered a case management order incorporating terms set out in the parties' joint report and plan, regarding service of requests for production of documents and responses thereto. In particular, defendants were allowed to serve up to five requests for production in connection with any noticed deposition, with responses to those requests due three business days after service. On or about May 16, 2014, defendants served their first request for production of documents, for which response was due by midnight on Wednesday, May 21, 2014. Defendants' first request for production the following requests, in summary:

1. The bid for the Contract (W91249–12–C–0017).

2. The Contract.

3. Exemplar of each trade secret allegedly used or disclosed by defendant Tuschen.

4. Exemplar of each trade secret allegedly misappropriated by defendants.

5. Statement of Indirect Expenses for two time periods: (i) the date around defendant Tuschen's resignation and (ii) the most current statement.

6. Application and resume of each RLM employee who left employment since January 1, 2010.

7. Documents supporting claims.

Defendants provided plaintiff with an extension to respond to the morning of May 22, 2014. At 10:26 p.m. on May 22, 2014, plaintiff first responded to the first request for production of documents via email, stating that documents will be delivered the next day. On May 27, 2014, plaintiff served its supplemental response to defendants first request for production, setting forth objections that may be summarized in pertinent part as follows (by request number):

1. Objection: contains trade secret; will produce redacted copy of bid.

2. Objection: contains confidential information; will produce redacted copy of Contract.

3. Objection: vague, overbroad; will produce index.

4. Objection: vague, overbroad; will produce index.

5. Objection: vague, overbroad, contains confidential information; will produce redacted copy.

6. Objection: overbroad; contains confidential information; will produce redacted copy.

7. Objection: overbroad; refers to previous responses.

That same date, plaintiff served responsive documents in redacted format to defendants. On May 27, 2014, the clerk received a call from counsel for defendants stating that the parties had a discovery dispute, where defendants asserted need to have a copy of the bid for the Contract for deposition of plaintiff's Rule 30(b)(6) representative the next day, but that plaintiff contended that the information requested constitutes trade secrets. On May 28, 2014, the court entered an order noting the discovery dispute and directing a telephonic conference regarding the discovery dispute before Magistrate Judge Robert B. Jones, Jr., on Friday, May 30, 2014, at 10:00 a.m. At conference, some issues were resolved and others remained in dispute. During the conference, Magistrate Judge Jones asked the parties to consider if an "Attorney's Eyes Only" designation would be workable.

On May 31, 2014, defendants filed a motion to compel production of documents in response to the first request for production of documents. (DE 42). The motion

to compel sought complete responses to requests numbered 1, 2 and 5, without use of an "Attorney's Eyes Only" designation. On June 4, 2014, the clerk received emails regarding continued issues in discovery, noting that dispute remained regarding requests numbered 1, 2, and 5, as well as continued difficulty with requests numbered 3, 4, and 6. Only request number 7 was reported to have no issue. On June 4, 2014, the court noticed hearing on June 16, 2014, on the motion.

On June 5, 2014, plaintiff offered to produce documents responsive to requests 1, 2, 3, 4, 5, and 6, subject to "Attorney's Eyes Only" designation. On June 11, 2014, and June 12, 2014, plaintiff proposed a stipulated protective order containing an "Attorney's Eyes Only" designation. On June 12, 2014, defendants stated it would honor an "Attorney's Eyes Only" designation until the court ordered otherwise, and that it had at that time accepted plaintiff's response to request number 6. On June 13, 2014, plaintiff offered to produce unredacted copies of responses to requests 1, 2, 5, as well as documents responsive to 3, and 4, under the terms of its proposed protective order. Plaintiff also filed a response to the motion to compel.

At hearing held June 16, 2014, the court ordered in pertinent part as follows. First, the court entered the proposed protective order, including "Attorney's Eyes Only" designations. Second, the court ordered production of complete responses to requests 1, 2, 3, 4, and 5, designated "Attorney's Eyes Only." Third, the court noted that, having granted the substance of defendants' motion in substantial part, the court will award at least part of defendants' reasonable expenses incurred. Defendants submitted in support of their request for costs a proposed order and declaration of costs setting forth attorney's fees and expenses of $8,851.55 in

connection with the motion to compel. After considering proposed order filed by plaintiff, as well, the court entered an order on June 23, 2014, directing plaintiff to show cause why it should not pay defendants' costs incurred as requested. Plaintiff responded to the order to show cause on July 3, 2014.

■ Pursuant to Federal Rule of Civil Procedure 37(a)(3), a party seeking discovery may move for an order compelling production, if a party fails to answer an interrogatory or request for production. Rule 26(b)(1) states in relevant part, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." "All objections must be stated with specificity, and any objection not raised is waived." *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C.2010). "The party resisting discovery bears the burden of showing why it should not be granted," and it "must make a particularized showing of why discovery should be denied, and conclusory or generalized statements fail to satisfy this burden as a matter of law." *Mainstreet Collection, Inc.*, 270 F.R.D. at 241.

"If [a] motion [to compel] is granted or if the disclosure or requested discovery is provided after the motion was filed the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising their conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed.R.Civ.P. 37(a)(5). "But the court must not order this payment if: ... (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other

circumstances make award of expenses unjust." *Id.* Further, where a motion to compel is granted in part and denied in part, the court may "apportion the reasonable expenses for the motion." *Id.*

 Under the circumstances presented here, the court determines that a partial award of reasonable expenses is warranted, apportioned in accordance with the findings below. Plaintiff did not respond to defendants' first request for production of documents at the time required (May 22, 2014, in the morning) nor completely when the first response was made (May 22, 2014, at 10:26 p.m.). The supplemental response served May 27, 2014, was not timely. With respect to that time period up through May 27, 2014, the court therefore will award 100% of defendants' reasonable expenses stated in the declaration of costs.

 The objections asserted in plaintiff's supplemental response served May 27, 2014, were partially justified in light of the outcome of proceedings following hearing on June 16, 2014. In particular, objections to requests 1, 2, and 5, were justified and plaintiff was justified in awaiting resolution of confidentiality designations as to these requests. Plaintiff did not object to requests 3 and 4 on the basis of confidentiality, but ultimately produced documents in full subject to that condition. Tardy and insufficient responses to requests 3 and 4 thus were not justified. Accordingly, with respect to the time period from May 28, 2014, through the date of the magistrate judge conference, May 30, 2014, the court will award two-fifths (40%) of defendants' reasonable expenses stated in the declaration of costs.

While the magistrate judge suggested "Attorney's Eyes Only" designation on May 30, 2014, plaintiff did not immediately accept the compromise approach. Plaintiff offered production of requests 1, 2, 3, 4, 5, as pertinent here, under "Attorney's Eyes Only" designation, informally on June 4, 2014, and formally in proposed protective order on June 12, 2014, reiterated in offer of production on June 13, 2014. Where the court later held this designation to be warranted, the court finds that award of defendants' expenses incurred in compelling production after this date are not apportionable reasonably to plaintiff. However, all (100%) reasonable expenses incurred between the time Magistrate Judge Jones suggested such a designation and the time plaintiff formally proposed production under terms of protective order, on June 13, 2014, are warranted.

In sum, a reasonable apportionment expenses involves accounting for a percentage of defendants' expenses, as listed in defendants' declaration of costs, as follows:

05/23/14 through 05/27/14: (100% of .8 hours attorney time) .8 hours

05/28/14 through 05/30/14: (40% of 7.8 hours attorney time) 3.12 hours

05/31/14 through 06/13/14: (100% of 3.3 hours attorney time) 3.3 hours

06/12/14 through 06/18/14: no expenses awarded

This results in a total of 7.22 hours attorney time apportionable to award to defendants. The court finds reasonable the proposed hourly rate of $425 per hour, based on the declaration of counsel regarding his level of experience and representations regarding fees normally charged to clients by counsel. Multiplying the 7.22 hours attorney time by the $425 hourly rate yields an expense award of $3,068.50. Based on the time, labor, and skill required to perform the legal services properly, the fee customarily charged in this locality for similar legal services, the amounts involved apportioned as set forth above, the results obtained, and the experi-

ence, reputation, and ability of the attorney performing the services, the court finds attorneys fees, with no additional costs noted during the applicable time period, to be reasonable.

Therefore, the court will award defendants costs in the amount of $3,068.50, reasonably incurred in part in prosecution of defendants' motion to compel.

## CONCLUSION

Based on the foregoing, the court GRANTS defendants' motion for summary judgment (DE 6) and DENIES plaintiff's motion for permanent injunction (DE 17). The court ORDERS that plaintiff shall pay defendants' reasonable costs in the amount of **$3,068.50,** pursuant to Federal Rule of Civil Procedure 37(a)(5), based upon the findings stated herein. The clerk is DIRECTED to close this case.